

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 16, 2024**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **FRESH ACQUISITIONS, LLC, et al.,** | § | **Case No. 21-30721-sgj11** |
| Debtors. | § | **Chapter 11 (Jointly Administered)** |
| ―――――――――――――――――――――― | § | |
| | § | |
| **DAVID GONZALES, as TRUSTEE of the** | § | |
| **Fresh Acquisitions Liquidating Trust,** | § | |
| Plaintiff, | § | |
| | § | **Adversary No. 22-03098-sgj** |
| v. | § | **Civil Action No. 3:23-cv-00624-D** |
| | § | |
| **RIVER NORTH FURR'S, LLC, an** | § | |
| **Illinois limited liability company,** | § | |
| Defendant. | § | |
| ―――――――――――――――――――――― | § | |

### REPORT AND RECOMMENDATION TO DISTRICT COURT REGARDING
### COMPETING MOTIONS FOR SUMMARY JUDGMENT [DE # 89, 93]

**TABLE OF CONTENTS**

I.      **Introduction**................................................................................................... 1

II.     **Undisputed Facts**.......................................................................................... 4

   A.     **The AB&T Loan, the River North Litigation, and the River North
Settlement Agreement** ........................................................................ 5

   B.     **The Use of Proceeds from Paycheck Protection Program Loans in
Connection with the River North Settlement** .................................... 11

   C.     **Ownership and Control of the Relevant Bank Accounts** ................ 18

III.    **Jurisdiction and Procedural History**........................................................ 23

IV.    **Summary Judgment Standard**................................................................... 24

V.     **Discussion**.................................................................................................. 27

   A.     **Property of the Estate: The Threshold Avoidance Action Requirement**....... 30

     1.    The Fifth Circuit case of *In re Compton Corp.* provides the framework for
evaluating letter of credit transactions in property of the estate inquiries. ........... 31

     2.    River North attempts to invoke the earmarking doctrine....................................... 38

     3.    River North also asserts a similar de facto owner defense. .................................. 43

   B.     **Whether the Settlement Payments Were Property of the Debtor FMP SA
That Would Have Become Property of the Bankruptcy Estate** .................... 49

     1.    The de facto owner defense is unavailable. .......................................................... 50

     2.    The earmarking doctrine does not apply................................................................ 52

     3.    *Compton* does not allow River North's desired result. ........................................ 55

**C.**         **Resolving the Competing Motions for Summary Judgment**........................... 56

    1.       The actual fraudulent transfer claims should proceed to trial.............................. 57

      i.        Alleged fraud in connection with the Guaranty Assumption....................... 59

      ii.       Alleged fraud in connection with the PPP loans........................................... 64

    2.       River North is entitled to summary judgment on the constructive fraudulent transfer claims.................................................................................................... 74

    3.       The Plaintiff is entitled to summary judgment on the § 549(a) postpetition transfer. ............................................................................................................... 79

**VI.**         **Recommendation to the District Court**................................................................ 80

## I.  **INTRODUCTION**

The above-referenced post-confirmation adversary proceeding pertains to the bankruptcy cases of Fresh Acquisitions, LLC ("Fresh") and fourteen related entities.  On April 20, 2021 (the "Petition Date"), Fresh and these fourteen entities (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").  The fifteen Debtors were in the restaurant business, with most of their establishments operating under the names "Furr's" or "Tahoe Joe's."  The Debtors' cases were administratively consolidated (the "Bankruptcy Case").  Later, pursuant to a request in a Chapter 11 plan, the fifteen Debtors were substantively consolidated—as a result of evidence that the Debtors had operated on a consolidated basis; generally had the same officers, managers, and directors; regularly commingled cash amongst them and various non-debtor affiliates; and due to the fact that numerous creditors filed duplicative claims in several of the Debtor entity cases, suggesting that creditors viewed the Debtors as a single entity (or were not sure with whom they were dealing).

The Debtors' organizational structure was broad and complex.  There was more to the business enterprise (the "Fresh Enterprise") than simply the fifteen entities that filed Chapter 11. The following persons collectively controlled and were indirect majority owners of each of the Debtors:  Allen Jones, Jason Kemp, Larry Harris, and Brian Padilla (collectively, the "Owners"). Their ownership and control of the Debtors was accomplished mostly indirectly—through personal operating companies and various management companies.  By way of example, the Debtor entity that is at the center of this adversary proceeding is called **FMP SA Management Group, LLC ("FMP SA")**.  It was owned by a non-debtor entity known as Catalina Restaurant Group, Inc.,

which was, in turn, owned by a non-debtor entity known as Alamo CRG, LLC, which was, in turn, partially owned by the Owners. Suffice it to say there were layers and layers of companies in the Fresh Enterprise.

An Official Committee of Unsecured Creditors ("UCC") was appointed during the Bankruptcy Case, and it was very active. It proposed its own *First Amended Joint Chapter 11 Plan of Liquidation* (the "Plan") for the Debtors. The Plan was ultimately confirmed by the Bankruptcy Court in its *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming The Official Committee of Unsecured Creditors' First Amended Joint Chapter 11 Plan of Liquidation* (the "Confirmation Order"), entered on December 20, 2021. Pursuant to the Plan, a trust known as the Fresh Acquisitions Liquidating Trust (the "Trust") was created, and David Gonzales, the plaintiff herein, was appointed as the post-confirmation trustee (the "Plan Trustee" and/or "Plaintiff"). In accordance with the terms of the Plan, the Confirmation Order, and the Fresh Acquisitions Liquidating Trust Agreement, numerous "Causes of Action" of the Debtors were vested in the Trust, and the Plan Trustee was granted standing to prosecute the Causes of Action. More generally, all the Debtors' assets, as provided in § 541 of the Bankruptcy Code, were transferred to and vested in the Trust.

This adversary proceeding is one of several being pursued by the Plan Trustee. It involves certain transfers of property made to the Defendant—an entity called **River North Furr's, LLC** (the "Defendant" or "River North")—a short time before the bankruptcy filings (as well as one transfer that the Defendant received afterwards). The Plan Trustee alleges that the transfers are avoidable and recoverable, as either actual or constructive fraudulent transfers, pursuant to

Bankruptcy Code §§ 544, 548, and 550,[1] and that the one transfer received by the Defendant postpetition is possibly avoidable and recoverable pursuant to §§ 549 and 550.  Interestingly, the transfers (i.e., thirteen different payments in all) were made as part of a ***settlement*** of a prepetition lawsuit between: (a) **the Defendant River North** (who, at the time of the settlement, happened to be a 20% equity investor in the ultimate parent company of Fresh—an entity named "Alamo Furr's, LLC," which was a non-debtor), on the one hand; and (b) **the Debtor FMP SA and the Owners**, on the other.  The settlement was reached eleven months before the Petition Date.  Additionally, the source of the funds transferred pursuant to the settlement (i.e., the thirteen different payments) is alleged to have been ***government-funded Paycheck Protection Program ("PPP") loan proceeds***, that were legally required to be utilized for such purposes as payroll, rent, mortgage payments, or utilities—not for purposes such as settling an investor lawsuit.

Most of the material facts are undisputed here.  But at bottom, this is an adversary proceeding that must explore whether a prepetition settlement of a lawsuit (and payments made pursuant thereto) might constitute either a constructive or fraudulent transfer(s), and how the use of PPP loan proceeds impacts that analysis.  Both Plaintiff and Defendant filed motions for summary judgment.  The Plaintiff seeks summary judgment on its ***actual*** fraudulent transfer claims (but not its constructive fraud claims) and on its § 549 claim.  The Defendant seeks summary judgment in its favor on ***all*** claims.  For the reasons explained below, the Bankruptcy Court

---

[1] *See* 11 U.S.C. § 548(a)(1)(A) (actual fraudulent transfer); Tex. Bus. Orgs. Code § 24.005(a)(1) (actual fraudulent transfer under TUFTA); 11 U.S.C. § 548(a)(1)(B) (constructive fraudulent transfer); Tex. Bus. Orgs. Code §§ 24.005(a)(2), 24.006 (constructive fraudulent transfer under TUFTA); *see also* 11 U.S.C. § 544(b) (which permits a trustee to avoid transfers that are avoidable under applicable law such as TUFTA, when an unsecured creditor would have such a right); 11 U.S.C. § 550 (which allows a trustee to recover property that has been the subject of an avoidable transfer, or the value of such property).

believes that the cross-motions should be denied in part and granted in part.  Specifically, the

Bankruptcy Court concludes that:  (a) summary judgment is **not** appropriate for either party on the

**actual** fraudulent transfer claims—those claims should proceed to trial; (b) the Defendant River

North is entitled to summary judgment on the **constructive** fraudulent transfer claims; and (c) the

Plan Trustee Plaintiff is entitled to summary judgment on the single **postpetition** transfer.  The

Bankruptcy Court respectfully recommends that the District Court rule as such.

## II.  <u>UNDISPUTED FACTS</u>

The undisputed summary judgment evidence consists of various agreements, deposition

testimony, and sworn declarations.[2]  As noted, the Plaintiff herein is the Plan Trustee, acting on

behalf of the Fresh Acquisitions Liquidating Trust.  In this instance, the Plan Trustee is suing on

behalf of the Debtor entity that was known as **<u>FMP SA</u>**, a Texas limited liability company.[3]  FMP

SA was a purported management company for entities in the Fresh Enterprise, including for the

"lead" Debtor Fresh.[4]

The Defendant herein, River North, is an Illinois limited liability company.[5]  River North

invested in and became a 20% owner/member of a **non-debtor** entity known as Alamo Furr's, LLC

("Alamo Furr's"), a Texas limited liability company.[6]  Alamo Furr's owned the equity interests in

---

[2] In this Report and Recommendation, the pin cites in citations to the parties' evidentiary exhibits refer to the ECF page numbers, which are consecutively paginated across the entire ECF filing (not to the individual exhibit page numbers).  The Defendant River North's exhibits span 729 pages at ECF No. 91-1.  The Plan Trustee Plaintiff's exhibits span two volumes:  Volume I at ECF No. 93-2 contains 694 pages, and Volume II at ECF No. 93-3 contains 269 pages.  The same applies to the parties' other filings—the ECF page number is referenced.
[3] Pl.'s Compl. 2, ¶ 6, ECF No. 1.
[4] App. vol I Trustee's Br. Supp. Mot. Partial Summ. J. [hereinafter Pl.'s App. vol. I] 271–74, ECF No. 93-2 (Calvert Dep.); Pl.'s App. vol. I, at 559–71 (Amended and Restated Management Agreement).
[5] Pl.'s Compl. 1, ECF No. 1.
[6] App. River North Furr's Mem. Supp. Mot. Summ. J. [hereinafter Def.'s App.] 42, ECF No. 91-1 (Pl.'s Original Compl., *River North Furr's, LLC v. FMP SA Mgmt. Grp.*, No. 5:19-cv-757 (W.D. Tex. June 27, 2019) ("RNF's

the Debtor Fresh (i.e., was its parent company).[7]   The remaining 80% of Alamo Furr's was held

by the Owners.

**A. The AB&T Loan, the River North Litigation, and the River North Settlement Agreement**

The story begins with certain loan transactions between: (i) the Debtor Fresh and some of

its various related entities, on the one hand, and (ii) Arizona Bank & Trust ("AB&T"), on the other.

***The AB&T Loan.***   On January 2, 2015, the Debtor Fresh and Alamo Dynamic, LLC

("Alamo Dynamic")[8]—the latter of which was yet another non-debtor entity in the sprawling Fresh

Enterprise—borrowed $8,707,500 from AB&T to refinance a loan used to complete the Owners'

purchase of the Debtor Fresh's outstanding equity securities (the "Fresh Loan Agreement").[9]   The

Fresh Loan Agreement provided that the borrowers, Fresh and Alamo Dynamic, would not "make

any distribution with respect to any capital account (other than for the limited purpose of ordinary

tax distributions) whether by reduction of capital or otherwise," absent AB&T's written consent.[10]

This is where the Debtor **FMP SA** (i.e., the alleged transferor in this fraudulent transfer

litigation) enters the picture.   At first, FMP SA (at the Owners' direction) merely guaranteed

Fresh's and Alamo Dynamic's obligations to AB&T under the Fresh Loan Agreement—thus, FMP

SA was not a primary obligor to AB&T subject to all the terms of the Fresh Loan Agreement.[11]

Additionally, when the Fresh Loan Agreement was executed, Fresh, FMP SA, and AB&T

---

investment constituted about 90% of the total initial capital in Alamo [Furr's] and resulted in a 20% minority
ownership interest in Alamo [Furr's].").
[7] Def.'s App. 5 (Alamo Furr's LLC Agreement, at § 2.5).
[8] Alamo Dynamic, LLC should not be confused with Alamo Dynamic Payroll, LLC.  These are two different non-debtor entities.
[9] *See* Pl.'s App. vol. I, at 572–88 (Fresh Loan Agreement).
[10] Pl.'s App. vol. I, at 579 (Fresh Loan Agreement).
[11] *See* Pl.'s App. vol. I, at 589–602 (Continuing Guaranty).

simultaneously entered into a subordination agreement, which rendered FMP SA's right to receive payments of management fees junior to Fresh's obligations to AB&T (recall that FMP SA was a purported management company for various of the entities in the Fresh Enterprise, including for the "lead" Debtor Fresh).[12]  In the event of a default under the Fresh Loan Agreement, the subordination agreement prohibited Fresh from paying any management fees to FMP SA without AB&T's prior written consent.[13]

Apparently, by May 2017, the principal amount under the Fresh Loan Agreement had increased to $14.5 million.  Significantly, at this point the Owners caused FMP SA to become a co-borrower under the Fresh Loan Agreement.[14]  This meant that all covenants applicable to the borrowers under the Fresh Loan Agreement applied to FMP SA as of May 2017—including the covenant not to "make any distribution with respect to any capital account."[15]

By March 2020, the borrowers under the Fresh Loan Agreement (which, at this point, included Fresh, Alamo Furr's, Alamo Dynamic, and FMP SA) were in default.[16]  FMP SA received over $4 million in management fees between at least 2015 and 2019.[17]  The Fresh Loan Agreement remained outstanding when the Debtors filed for bankruptcy.  As of the Petition Date, AB&T was

---

[12] See Pl.'s App. vol. I, at 603–14 (Management Fee Subordination Agreement).
[13] Pl.'s App. vol. I, at 605 (Management Fee Subordination Agreement).
[14] Pl.'s App. vol. I, at 615 (Amendment to Amended and Restated Promissory Note).
[15] Pl.'s App. vol. I, at 615 (Amendment to Amended and Restated Promissory Note).
[16] App. vol. II Trustee's Br. Supp. Mot. Partial Summ. J. [hereinafter Pl.'s App. vol. II] 16–22, ECF No. 93-3 (Notice of Default).
[17] See Def.'s App. 320, 107:5–25–108:1–11 (Madlinger Dep.); Pl.'s App. vol. I, at 630 (Fresh Acquisitions Management Fees from Inception).

a secured creditor of FMP SA holding a claim for $13,466,151.50, secured by a lien on substantially all of FMP SA's assets.[18]

***River North's Equity Investment in Alamo Furr's.*** How does the Defendant River North factor into all of this? River North acquired its 20% ownership interest in **Alamo Furr's** (recall that Alamo Furr's was the non-debtor parent company of the Debtor Fresh). This acquisition was in the year 2014 (even before the Fresh Loan Agreement with AB&T), through a $1.75 million capital contribution (all cash), pursuant to an amended LLC agreement of Alamo Furr's.[19] The only other equity holders in Alamo Furr's were the four Owners (collectively owning 80%—by the way, each contributing $50,000 in cash, but each also contributing $1.7 million in alleged services). All the Owners were managing members of Alamo Furr's, but River North was a mere member—thus, apparently a passive investor. River North's 20% equity interest in Alamo Furr's included a 5% annual preferred return on its investment over five years.[20] River North's preferred return in Alamo Furr's was guaranteed by yet another non-debtor entity called BIII Wing, LLC ("BIII").[21] BIII managed certain "Buffalo Wild Wings" restaurants, and the Owners held all of BIII's equity.[22] To be clear, BIII unconditionally guaranteed to River North the repayment of River North's initial capital contribution and any accrued but unpaid preferred return.

---

[18] *See* Ch. 11 Case No. 21-30721-sgj11, *Global Notes and Statement of Limitations, Methodologies, and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* 24, *available at* Ch. 11 Case No. 21-30731-sgj11, ECF No. 8.
[19] Def.'s App. 1 (Alamo Furr's LLC Agreement).
[20] Def.'s App. 7 (Alamo Furr's LLC Agreement).
[21] Def.'s App. 7 (Alamo Furr's LLC Agreement); Def.'s App. 32–33 (Unconditional Guaranty of Payment and Performance).
[22] Def.'s App. 7 (Alamo Furr's LLC Agreement).

Alas, the very next year, in 2015, the Owners sold the Buffalo Wild Wings restaurants that were managed by BIII.  Thus, BIII—River North's guarantor on the preferred return from Alamo Furr's—would no longer earn any revenue from managing those restaurants.[23]  When River North learned of this, it demanded that Alamo Furr's provide a replacement guarantor.[24]  The Owners acquiesced and, on November 30, 2015, **FMP SA**—the Debtor entity at the center of this adversary proceeding—assumed BIII's guarantee obligation under an *Assignment and Assumption Agreement with Novation* (the "Guaranty Assumption").[25]  River North did not contribute any new capital, nor any other consideration at this time, in exchange for FMP SA stepping into BIII's shoes under the Guaranty Assumption.[26]  Note that FMP SA has never had any membership interests or other rights or interests of any kind in Alamo Furr's.

*__River North Litigation.__*  By June 2019, River North had been waiting five years without any payment on its preferred return from Alamo Furr's.  This prompted it to sue **FMP SA, as guarantor, and the four Owners**, alleging that River North was entitled to repayment of its capital contribution to Alamo Furr's and the preferred return, pursuant to the Alamo Furr's LLC Agreement, and was also entitled to enforce the guaranty against FMP SA.[27]  River North did not sue Alamo Furr's—which was, of course, the non-debtor party that was primarily liable for repayment of River North's initial capital contribution and preferred return.  Besides asserting a breach of contract claim against FMP SA (i.e., breach of the Guaranty Assumption), River North

---

[23] Pl.'s App. vol. I, at 82–83 (Madlinger Dep.).
[24] Pl.'s App. vol. I, at 83–84 (Madlinger Dep.).
[25] Def.'s App. 34 (Guaranty Assumption).
[26] Pl.'s App. vol. I, at 89–92 (Madlinger Dep.).
[27] Def.'s App. 42 (River North Litigation).  The case was designated Civil Action No. 5:19-cv-757 in the United States District Court for the Western District of Texas.

asserted various tort causes of action against the Owners including statutory fraud under the Texas Business and Commercial Code § 27.01, civil conspiracy, and fraudulent inducement.[28] River North alleged that FMP SA had generated $14.7 million in revenue and $8.6 million in profits in 2016, and $9.6 million in revenue and $4.3 million in profits in 2017.[29] Yet FMP SA had paid nothing on the River North preferred return—all the while distributing $12 million to the Owners over these two years.[30] River North argued that it should have been repaid on its investment by now. It asserted that FMP SA's total exposure for its guaranty in this lawsuit was more than $2.5 million.[31]

*River North Settlement.* The litigation settled, effective May 14, 2020, with River North agreeing to accept a series of payments totaling $1.85 million,[32] as documented in a *Redemption and Settlement Agreement and Release of All Claims* (the "Settlement Agreement" or "River North Settlement"),[33] FMP SA's legal team apparently considered the $1.85 million settlement a significant "win" for FMP SA—considering that $2.5 million had been sought.[34] Remember, this was simply a suit on a guaranty, as to the Debtor FMP SA.

---

[28] Def.'s App. 54–59 (River North Litigation).

[29] Pl.'s App. vol. I, at 239 (River North Litigation).

[30] Pl.'s App. vol. I, at 240 (River North Litigation).

[31] *See* Def.'s App. 467, 32:5–18 (Brodrick Dep.).

[32] Def.'s App. 118–28 (Settlement Agreement). Although the Settlement Agreement was executed on May 13, 2020, the agreement provided that its effective date was "the date of execution by the last party to sign it below or the date on which the FMP Parties provide RNF a copy of the Irrevocable Standby Letter of Credit . . . ." Def.'s App. 118 (Settlement Agreement). The Letter of Credit was not executed until May 14, 2020. Def.'s App. 270, 279 (Irrevocable Letter of Credit). The record is unclear as to when a copy of the executed Letter of Credit was delivered to River North. But it was not before May 14, 2020.

[33] The Plan Trustee refers to the agreement as a "Redemption Agreement," while River North refers to it as a "Settlement Agreement." The two are one in the same.

[34] Def.'s App. 468, 35:16–24 (Brodrick Dep.).

To be clear, the parties to the Settlement Agreement were River North, FMP SA, and the four Owners.[35]  The Settlement Agreement called for the redemption (or buy-back, essentially) of River North's entire 20% equity/membership interest in Alamo Furr's—as well as a release of all litigation claims—in exchange for thirteen periodic payments (the "Settlement Payments") to River North totaling $1.85 million.[36]  The Settlement Payments were the obligation of Debtor FMP SA and the four Owners.  The Settlement Payments would consist of an initial $500,000 paid in May 2020, with the remainder paid in $112,500 periodic payments.[37]

The structure of the settlement is significant to the legal analysis here.  Specifically, as part of the Settlement Agreement, the parties agreed that FMP SA and the four Owners would ***obtain a standby letter of credit, to secure and facilitate the Settlement Payments***.[38]  Accordingly, FMP SA and the four Owners went to AB&T for the letter of credit.  AB&T issued a letter of credit (the "Letter of Credit") for $1.85 million, with River North designated as the beneficiary, and FMP SA—along with the four Owners—as the designated borrowers.[39]  As part of the process, AB&T required a deposit account to be established at AB&T as a "restricted collateral account" (the "Collateral Account") ***to secure the Letter of Credit and facilitate the Settlement Payments***.[40]  This Collateral Account was a newly created account—technically a business checking account.  On **May 14, 2020** (approximately eleven months before the bankruptcy Petition Date of FMP SA

---

[35] Def.'s App. 118 (Settlement Agreement).
[36] Def.'s App. 119 (Settlement Agreement).
[37] *See* Def.'s App. 119 (Settlement Agreement).
[38] Def.'s App. 119 (Settlement Agreement).
[39] Def.'s App. 268 (Irrevocable Letter of Credit).
[40] Def.'s App. 264, ¶ 4 (Klussman Decl.); Pl.'s App. vol. II, at 92 (FMP SA Collateral Account Bank Statement); Pl.'s App. vol. II, at 248, ¶¶ 14–15 (Calvert Suppl. Decl.) ("The -7655 Collateral Account was set up for one purpose—to make the $1,850,000 payments under the River North redemption agreement.").

and the other Fresh Debtors), FMP SA executed an *Assignment of Deposit Account* (the "Collateral Assignment"), **pledging the Collateral Account to AB&T as security for the Letter of Credit**.[41] The same day, FMP SA and the four Owners executed a *Promissory Note* (the "Note") in favor of AB&T for $1.85 million.[42]

Here's where things get even more structurally significant, for purposes of this adversary proceeding. **AB&T was never called upon to pay River North in the form of a draw under the Letter of Credit.** The Letter of Credit was structured as a "standby" facility where the Debtor-FMP SA's default was a precondition. The Settlement Payments were made as agreed. Specifically, **all Settlement Payments were made from the funds that FMP SA had deposited into the Collateral Account**. Twelve payments occurred in the eleven months leading up to the Petition Date, while the final $112,500 payment to the Defendant occurred ten days after the Petition Date.

### B. The Use of Proceeds from Paycheck Protection Program Loans in Connection with the River North Settlement

Another significant aspect of the River North Settlement involves the indisputable use of Paycheck Protection Program loan proceeds obtained by entities in the Fresh Enterprise to fund it. In March 2020, state and local governments throughout the country began issuing stay-at-home and business closure orders in response to the COVID-19 pandemic. That same month, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") of 2020 was signed into law, which established the federal Paycheck Protection Program.[43] The PPP was implemented by the

---

[41] Def.'s App. 282–85 (Collateral Assignment).
[42] Def.'s App. 287–88 (Promissory Note).
[43] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (codified at 15 U.S.C. § 636(a)(36)).

United States Small Business Administration ("SBA") to provide small businesses with loans so they could maintain payroll during the COVID-19 pandemic, hire back employees who had been laid off, and cover applicable overhead, including mortgages, rent, and utilities.[44]  If a PPP borrower used the funds for enumerated expenses, the PPP loans would be forgiven by the federal government.[45]

According to the PPP loan forgiveness applications ("PPP Forgiveness Applications") submitted into evidence, *six entities in the Fresh Enterprise (the "PPP Borrowers")* applied for and received $18,935,200 in PPP funding, with AB&T as the lender.[46]  Two of these six entities in the Fresh Enterprise were among the Chapter 11 Debtors (**Buffets, LLC** and **Fresh**)—they received a combined amount of $12,996,600 ($10 million to Buffets, LLC and $2,996,600 to Fresh).[47]  *To be clear, six entities within the Fresh Enterprise received $18,935,200 of PPP loans, and two Debtor-entities were the recipients of $12,996,600 of these PPP loans*.  The PPP loan applications ("PPP Loan Applications") were filed on **April 7, 2020**, and funds were disbursed

---

[44] *See* Small Business Act, Pub. L. No. 83-163, 67 Stat. 232 (codified as amended at 15 U.S.C. § 631 *et seq.*).

[45] *See* 15 U.S.C. § 636(a)(37)(J).  After a PPP loan forgiveness application was approved, the federal government would reimburse the PPP lender.

[46] Per the Loan Forgiveness Applications, the Fresh Enterprise borrowers indicated their receipt of PPP loans (and were also seeking forgiveness) in the following loan amounts, and, in each case, certified that all amounts were used to pay business costs that were eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures) and included payroll costs equal to at least 60% of the forgiveness amount:  (1) Alamo Dynamic, LLC, $1,246,800 disbursed April 20, 2020, *see* Pl.'s App. vol. II, at 161–71; (2) Buffets, LLC, $10,000,000 disbursed April 16, 2020, *see* Pl.'s App. vol. II, at 171–84; (3) Fresh Acquisitions, LLC, $2,996,600 disbursed April 17, 2020, *see* Pl.'s App. vol. II, at 185–94; (4) Sushi Zushi of Texas, LLC, $2,094,400 disbursed April, 17, 2020, *see* Pl.'s App. vol. II, at 195–208; (5) TXFMP Management, LLC, $1,108,800 disbursed April 16, 2020, *see* Pl.'s App. vol. II, at 209–22; and (6) Zios Restaurant Company, LLC, $1,488,600 disbursed April 20, 2020, *see* Pl.'s App. vol. II, at 223–32.

[47] Klussman stated in his sworn declaration that Debtor entities Buffets, LLC and Fresh had their $12,996,600 in combined loan amounts forgiven in June and July of 2021, respectively, after which the United States government reimbursed AB&T for those amounts.  *See* Def.'s App. 265–66, ¶¶ 9–12 (Klussman Decl.).

later that month.[48]  This was shortly before the River North Settlement was implemented on **May 14, 2020**.

The mechanics worked as follows.  As a statutory precondition for obtaining the PPP loans, each of the PPP Borrowers submitted to AB&T (recall that AB&T was the secured lender for the Fresh Enterprise, dating back to 2015) a Paycheck Protection Program Borrower Application Form 2483.[49]  Each of the PPP Loan Applications were signed on April 7, 2020, by an individual named Nathan Calvert, in his capacity as corporate controller of the PPP Borrowers.[50]  Calvert was also the former Vice President and Corporate Controller of the Debtor FMP SA.[51]

Once the $18,935,200 of PPP loan proceeds were obtained by the six PPP Borrowers in the Fresh Enterprise, things get a little complicated—but not opaque—one simply has to follow the bouncing ball, a bit.  First, the $18,935,200 in PPP loan proceeds were received by the **six PPP Borrowers** into their bank accounts at AB&T (again, the Debtor Buffets, LLC received $10 million of this and the Debtor Fresh received $2,996,600 of this).  Then, all of these funds were pushed down (i.e., transferred) within the next two weeks (April 17–20, 2020) from the six PPP Borrowers' bank accounts into six newly created bank accounts that were held in the name of **six payroll company affiliates**—two of which were Debtor entities (one called Alamo Buffets

---

[48] *See* PPP Borrower Application signature pages at Pl.'s App. vol. II, at 138, 142, 146, 150, 154, 158.

[49] *See* Pl.'s App. vol. II, at 137–40 (Alamo Dynamic PPP Loan Application); Pl.'s App. vol. II, at 141–44 (Buffets PPP Loan Application); Pl.'s App. vol. II, at 145–48 (Fresh PPP Loan Application); Pl.'s App. vol. II, at 149–52 (Sushi Zushi PPP Loan Application); Pl.'s App. vol. II, at 153–56 (TXFMP PPP Loan Application); Pl.'s App. vol. II, at 157–60 (Zios PPP Loan Application).

[50] *See* PPP Loan Application signature pages at Pl.'s App. vol. II, at 138, 142, 146, 150, 154, 158.  It should also be noted that Nathan Calvert was formerly a defendant in these related Fresh adversaries.  *See* Pl.'s Verified Third Am. Compl., ECF No. 29, *Gonzales v. Cortes*, Adv. No. 23-03058 (Bankr. N.D. Tex. Nov. 9, 2023) (naming Nathan Calvert as a co-defendant); Stip. & Agreed Order re: Claims Against Calvert, ECF No. 44, *Gonzales v. Cortes*, Adv. No. 23-03058 (Bankr. N.D. Tex. Jan. 3, 2024) (voluntarily dismissing all claims against Nathan Calvert).

[51] Pl.'s App. vol. I, at 264–68, 272 (Calvert Dep.); Pl.'s App. vol. II, at 106–07, ¶¶ 2–5 (Calvert Decl.).

Payroll, LLC and one called Alamo Fresh Payroll, LLC) and four of which were non-debtor entities.[52]  Next, on April 24, 2020, $7 million of the original $18,935,200 in PPP loan proceeds was transferred from these newly created bank accounts of the six payroll company affiliates to a virtually empty bank account of a non-debtor entity called **TXFMP Management LLC (“TXFMP”)** (of this $7 million, $4.25 million was transferred from the two Debtor payroll company entities;[53] specifically, $2.5 million was transferred from Debtor Alamo Buffets Payroll, LLC and $1.75 million was transferred from Debtor Alamo Fresh Payroll, LLC).[54]  ***This TXFMP account was a money market account that had only $196.95 in it on April 24, 2020, immediately before the incoming $7 million transfer***.  At this point, the $7 million was commingled ($4.25 million of which had originated from Debtor PPP Borrowers and $2.75 million of which had originated from non-debtor PPP Borrowers).

The funds remained in TXFMP’s money market account for approximately three weeks, until May 14, 2020—the date of the execution of the River North Settlement—when TXFMP transferred $1.85 million to **FMP SA’**s main operating account at AB&T (the “Operating Account”), which was almost empty at the date of this transfer.[55]  To be clear, at the beginning of

---

[52] The four non-debtor entities were called Alamo Dynamic, LLC, Alamo SZ Payroll, LLC, TX Alamo Business Group, LLC, and Alamo Zik Payroll, LLC.

[53] Def.’s App. 289 (Alamo Dynamic Payroll Bank Statement) ($250,000 wire out to TXFMP account ending 3491); Def.’s App. 290 (Alamo SZ Payroll Bank Statement) ($1,250,000 wire out to TXFMP); Def.’s App. 291 (Alamo ZIK Payroll Bank Statement) ($1,000,000 wire out to TXFMP); Def.’s App. 292 (TX Alamo Business Group Bank Statement) ($250,000 wire out to TXFMP).  All four entities are non-debtors.

[54] Pl.’s App. vol. II, at 250 (Alamo Buffets Payroll Bank Statement) ($2,500,000 wire out to TXFMP); Pl.’s App. vol. II, at 253 (Alamo Fresh Payroll Bank Statement) ($1,750,000 wire out to TXFMP).  Both entities are Debtors.

[55] Pl.’s App. vol. II, at 27 (FMP SA Operating Account Bank Statement); Pl.’s App. vol. II, at 248, ¶ 13 (Calvert Suppl. Decl.) (“At the direction of Jason Kemp, I caused TXFMP to transfer $1,850,000 from the TXFMP -3491 Account to FMPSA’s main operating account at ABT, having an account number ending in -3056.”).

the business day on May 14, 2020, FMP SA had only $6,023.32 in this account at AB&T.[56]  That

same day (again May 14, 2020—the execution date of the River North Settlement), FMP SA

transferred $1.85 million from the Operating Account to its newly created (i.e., created on May 7,

2020) Collateral Account (i.e., FMP SA's restricted business checking account that secured the

Letter of Credit that was established in connection with the River North Settlement).[57]  And after

the $1.85 million was transferred to the Collateral Account, FMP SA had only $6,023.23

remaining in its Operating Account (i.e., the same balance it had in the account before it received

the $1.85 million transfer from the TXFMP money market account).[58]  On May 15, 2020, the initial

$500,000 settlement payment to River North was made *from the Collateral Account*.[59]  The

remaining twelve payments required under the Settlement Agreement were made periodically

*from the Collateral Account*.[60]  *Again, there were no draws on the standby letter of credit*.  Also,

no monies other than the $1.85 million were ever funded into the Collateral Account.  The inserted

flow chart, submitted by the Plaintiff, appears to correctly reflect (based on the summary judgment

evidence) the funds-flow of PPP loan proceeds, from first received within the Fresh Enterprise,

traced to the ultimate $1.85 million that funded the River North settlement.[61]

---

[56] FMPSA Management Group, LLC Arizona Bank & Trust -3056 Account Statement Ending May 31, 2020, Pl.'s App. vol. II, at 29.
[57] The FMP SA Operating Account's beginning and ending balances on the bank statement ending May 27, 2020 were a mere $2,981.92 and $17,860.58.  This simply shows that there was some evidence of further commingling of funds once at the FMP SA level.  *See* Pl.'s App. vol. II, at 27 (FMP SA Operating Account Bank Statement).
[58] Pl.'s App. vol. II, at 29 (FMP SA Operating Account Bank Statement).
[59] Pl.'s App. vol. II, at 92 (FMP SA Collateral Account Bank Statement).
[60] *See* Pl.'s App. vol. II, at 93–103 (FMP SA Collateral Account Bank Statement).
[61] *See* Pl.'s Mem. L. Supp. Mot. Partial Summ. J. 27, ECF No. 94 (funds-flow chart).  A similar funds-flow chart was submitted into evidence by both parties.  *See* Def.'s App. 207; Pl.'s App. vol. II, at 90.



Nathan Calvert's sworn declaration submitted in this adversary proceeding stated that he had the responsibility of tracking the PPP loan disbursements to facilitate the Settlement Payments.[62]  It is undisputed that Calvert knew that PPP loan funds would be used for the Settlement Payments:

> Before receiving the PPP funds, at the Owners' direction, I [(Mr. Calvert)] caused ABT to establish new bank accounts in same of the six affiliates that processed payrolls . . . .  After establishing these new bank accounts each PPP borrower transferred all of its PPP loan proceeds . . . .  The -7655 Collateral Account was setup for one purpose—to make the $1,850,000 payments under the River North redemption agreement.[63]

Within its PPP Loan Application, each PPP Borrower certified to AB&T that "[a]ll SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule" and "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."[64]  The PPP Loan Applications also required that the borrowers certify whether the funds will be used for payroll, lease/mortgage interest, utilities, and/or "other."[65]  No PPP Borrower selected "other" as a potential use for the funds.

Each of the PPP Borrowers applied for forgiveness of its PPP loan by submitting to AB&T a Paycheck Protection Program Loan Forgiveness Application Form 3508 ("PPP Forgiveness

---

[62] *See* Pl.'s App. vol. II, at 246–48, ¶¶ 6–15 (Calvert Suppl. Decl.).
[63] Pl.'s App. vol. II, at 246, 248, ¶¶ 8–9, 14 (Calvert Suppl. Decl.).
[64] *See* PPP Loan Applications cited *supra* note 50.
[65] *See, e.g.*, Pl.'s App vol. II, at 149 (Sushi Zushi PPP Loan Application).

Application").[66]   Within each of the PPP Forgiveness Applications, Jason Kemp (one of the

Owners), as President of the respective PPP Borrowers, certified to AB&T that "I understand that

if the funds were knowingly used for unauthorized purposes, the federal government may pursue

recovery of loan amounts and/or civil or criminal fraud charges."[67]   Based on the certifications

made in the PPP Forgiveness Applications, all of the approximately $19 million in PPP loans were

forgiven in full.[68]

### C.  Ownership and Control of the Relevant Bank Accounts

A fact issue has been raised as to who had ownership and control over the $1.85 million in

funds that were paid to River North—particularly, as the funds made their way from non-debtor

TXFMP, to FMP SA's Operating Account, then on to the FMP SA Collateral Account, and

ultimately to the Defendant River North from that Collateral Account.

Recall that, as part of the Settlement Agreement, the parties agreed that FMP SA and the

four Owners would obtain a standby letter of credit, to secure and facilitate the Settlement

Payments.[69]   That was done.  AB&T issued the Letter of Credit for $1.85 million, with River North

designated as the beneficiary, and FMP SA—along with the four Owners—as the designated

borrowers.[70]   The Letter of Credit facility's structure and the security arrangements in connection

therewith are particularly important for this analysis.  As mentioned, AB&T required the Letter of

Credit to be secured through the Collateral Assignment.  A deposit account (i.e., business checking

account) was established at AB&T as a "restricted collateral account" to both secure the Letter of

---

[66] *See* PPP Forgiveness Applications cited *supra* note 46.
[67] *See* PPP Forgiveness Application borrower certification pages at Pl.'s App. vol. II, at 162, 172, 186, 196, 210, 224.
[68] *See* PPP loan disbursement amounts cited *supra* note 46.
[69] Def.'s App. 119 (Settlement Agreement).
[70] Def.'s App. 268 (Irrevocable Letter of Credit).

Credit and facilitate the Settlement Payments.[71]   On May 14, 2020, FMP SA executed an *Assignment of Deposit Account* (the "Collateral Assignment"), pledging the Collateral Account to AB&T as security for the Letter of Credit,[72] and the same day, FMP SA and the Owners executed their Note in favor of AB&T for $1.85 million.[73]   As previously noted, all Settlement Payments were made from the funds that FMP SA had deposited into the Collateral Account—and this happened pursuant to wiring instructions FMP SA gave to AB&T at the time of the River North Settlement (i.e., Settlement Payments were automatically wired by AB&T on the dates they were due under the Settlement Agreement).

The "Grantor's Representations and Warranties" section of the Collateral Assignment states that the "Grantor [i.e., FMP SA] has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender . . . ."[74] The "Grantor's Representations and Warranties with Respect to the Collateral" section states the same.[75] This section also states: "No Prior Assignment.  Grantor has not previously granted a security interest in the Collateral to any other creditor."[76]

The $1.85 million Note was AB&T's method of reimbursement if it was ever required to make a payment to River North under the Letter of Credit.  The Note was not a term loan—it was

---

[71] Def.'s App. 264, ¶ 4 (Klussman Decl.); Pl.'s App. vol. II, at 92 (*FMP SA Management Group LLC Collateral Account Bank Statement*); Pl.'s App. vol. II, at 248, ¶¶ 14–15 (Calvert Suppl. Decl.) ("The -7655 Collateral Account was set up for one purpose—to make the $1,850,000 payments under the River North redemption agreement.  At Jason Kemp's direction, I caused ABT to transfer $1,850,000 from the FMPSA -3056 Account to the -7655 Collateral Account on May 14, 2020.  That is the only deposit I caused to be made to the -7655 Collateral Account.").
[72] Def.'s App. 282–85 (Collateral Assignment).
[73] Def.'s App. 287–88 (Promissory Note).
[74] Def.'s App. 282 (Collateral Assignment).
[75] Def.'s App. 282 (Collateral Assignment).
[76] Def.'s App. 282 (Collateral Assignment).

a revolving credit facility payable on demand.[77]  If AB&T was required to make a payment to River North from its own funds, the Note's balance would increase commensurately—due on demand.  But AB&T was never required to advance its own funds at any time.  Instead, AB&T disbursed the Settlement Payments periodically from the Collateral Account.  Once a payment was made, three commensurate reductions occurred simultaneously:  (1) River North's ability to draw from the Letter of Credit was reduced; (2) FMP SA and the four Owner's liability on the Note was reduced; and (3) AB&T's collateral was reduced because the remaining funds in the Collateral Account were diminished.

Control of the Collateral Account, and whether payments were made to reduce an antecedent debt, have been made core issues herein.  Speaking to these questions, River North obtained a sworn declaration from James Klussman, an AB&T corporate representative, which included that:

> *AB&T understood that the LOC secured payments related to a settlement agreement* with River North Furr's LLC made in April 2020, a copy of which was provided to AB&T.  The wire instructions for monthly payments to River North Furr's LLC were included in the settlement agreement and provided to AB&T.
>
> *Typically, AB&T maintains control over accounts like the Collateral Account*.  In this case, the Collateral Account was pledged as security for the LOC and Promissory Note, which in turn secured payments pursuant to the settlement agreement with River North Furr's LLC.  The pledge was documented by the Assignment of Deposit Account Agreement.  The Collateral Account was funded to the full amount of the LOC.  *AB&T then automatically disbursed payments* from the Collateral Account each month to River North Furr's LLC, as required by the settlement agreement, using the wire instructions in the settlement agreement.

---

[77] Def.'s App. 287 (Promissory Note) ("This Note evidences a straight line of credit.  Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances.  Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person."); Def.'s App. 288 (Promissory Note) ("This Note is payable on demand.").

> Each wire by the bank to River North Furr's *correspondingly reduced both the balance in the Collateral Account and the secured balance on the LOC*. Because the **Collateral Account was controlled by AB&T** *and could only be used to make the payments required by the settlement agreement*, such accounts are often referred to as or understood to be restricted collateral accounts.[78]

Nathan Calvert further testified in his deposition that he understood that the funds were held in a "secure account," and that AB&T—not he (Calvert)—transferred the funds to River North.[79] An email from AB&T's counsel similarly describes the arrangement: "The amount of the LOC was $1.85MM and the collateral account to secure the LOC was funded in that same amount. The collateral account automatically disbursed payments each month for 12 months to RNF, at which time the obligation owed to RNF was paid in full and the LOC expired."[80] And the Plaintiff responded to a River North interrogatory with a similar understanding that the wire instructions given to AB&T were provided by River North, and later in a deposition, that the Plaintiff was unaware of any other instructions provided to AB&T.[81]

That said, the Plaintiff points out that the AB&T documents "contain no covenant, promise, or restriction to use the money in the Collateral Account *only to pay River North*."[82] While this may be true, FMP SA's rights in the collateral were at least severely limited. As to rights in the Collateral Account, the Collateral Assignment states: "Grantor shall not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Collateral except as provided in this Agreement."[83] In contrast, the "[l]ender may . . . without first obtaining consent of Grantor . . .

---

[78] Def.'s App. 265, ¶¶ 6–8 (Klussman Decl.) (emphasis added).
[79] *See* Def.'s App. 525, 90:7–12 (Calvert Dep.).
[80] Def.'s App. 132 (Email from AB&T Counsel).
[81] Def.'s App. 146 (Trustee's Resp. Interrog. 11); Def.'s App. 386, 108:14-24 (Gonzales Dep.).
[82] Trustee's Resp. Opp'n Def.'s Mot. Summ. J. 23, ECF No. 95 (emphasis added).
[83] Def.'s App. 282 (Collateral Assignment).

exchange or release any Collateral or other security."[84]   At the same time, AB&T had possessory rights over the Collateral Account:   "While this Agreement is in effect, Lender may retain the rights to possession of the Collateral . . . ."[85]

Even still, the summary judgment evidence does indicate that the Collateral Account and the assets it held were at least owned by FMP SA—not AB&T.  The Collateral Account was titled "Arizona Bank & Trust as Agent FMP SA Management Group LLC Bank Controlled Account."[86] And the Collateral Assignment states that FMP SA as grantor "is the lawful owner of the Collateral free and clear of all loans, liens, encumbrances, and claims."[87]

On the one hand, the Plaintiff does not provide competing summary judgment evidence on the question of control over the Collateral Account.  He provides no contrary witnesses, testimony, or other evidence.  In response to Klussman's sworn statement that the Collateral Account "could only be used to make the payments required by the settlement agreement," the Plaintiff merely claimed that Klussman did not provide any documentary evidence to that effect.[88]   On the other hand, it is undisputed that the Operating Account—through which the Collateral Account was funded—was exclusively owned and controlled by FMP SA—and River North has provided no contrary evidence.

As explained below, all of these questions about the structure (i.e., the ownership and control) of the Collateral Account may be academic.  Why?  Because FMP SA, without a doubt,

---

[84] Def.'s App. 282 (Collateral Assignment).
[85] Def.'s App. 282 (Collateral Assignment).
[86] Def.'s App. 264, ¶ 4 (Klussman Decl.).
[87] Def.'s App. 282 (Collateral Assignment).
[88] Def.'s App. 265, ¶ 8 (Klussman Decl.); Trustee's Resp. Opp'n Def.'s Mot. Summ. J. 23, ECF No. 95.

had ownership and control of the $1,850,000 in funds used to implement the River North

Settlement on May 14, 2020—i.e., the date on which it, essentially, pre-funded the River North

Settlement by transferring the funds from its Operating Account to the Collateral Account.

Moreover, the summary judgment evidence is clear that the source of these funds was proceeds of

PPP loans that went to the Fresh Enterprise (albeit there was commingling of those PPP loan

proceeds—i.e., the PPP loan proceeds of two Debtor entities were commingled with the PPP loan

proceeds of four non-debtor entities).  The Court will discuss how this impacts the Plaintiff's

fraudulent transfer claims in the legal analysis below.

### III.    JURISDICTION AND PROCEDURAL HISTORY

Bankruptcy subject-matter jurisdiction exists in this adversary proceeding pursuant to 28

U.S.C. § 1334(b).  Although this is a "core" proceeding under 28 U.S.C. § 157(b)(2)(H), the

Bankruptcy Court lacks constitutional authority to enter a final judgment on the claims herein,

pursuant to *Stern vs. Marshall*[89] and its progeny, and also because the parties have requested a jury

trial and do not consent to the Bankruptcy Court presiding over the jury trial.  For these reasons,

the District Court has earlier ruled that the reference will be withdrawn by it "at such time as the

United States Bankruptcy Court certifies that the parties are ready for trial," pursuant to 28 U.S.C.

§ 157(d).[90]  As a result, the Bankruptcy Court may only submit a Report and Recommendation to

---

[89] 564 U.S. 462 (2011).
[90] District Ct. Order Granting Def.'s Mot. Withdraw Reference, ECF No. 50; *see also* Civil Action No. 3:23-cv-00624-D (the District Court action, pending before Senior District Judge Sidney A. Fitzwater, created upon filing the Motion to Withdraw the Reference).

the District Court if it believes that it is appropriate to grant a dispositive motion in favor of any

party.[91]  Venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

The two competing Motions for Summary Judgment were filed by the Plaintiff Plan

Trustee and the Defendant River North on December 28, 2023.[92]  Defendant River North moves

for summary judgment on all claims asserted against it in this adversary proceeding, while the

Plaintiff Plan Trustee only moves for summary judgment on the ***actual*** fraudulent transfer (i.e.,

not the constructive fraudulent transfer claims) and on the postpetition transfer.  The Bankruptcy

Court heard oral argument on the issues and took this matter under advisement on February 28,

2024.  The Bankruptcy Court now recommends that the District Court grant the Motions for

Summary Judgment in part and deny in part.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate whenever

a movant establishes that the pleadings, affidavits, and other evidence available to the court show

that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of

law.  *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).[93]  The Supreme

Court has instructed that Rule 56 "mandates the entry of summary judgment, after an adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

---

[91] Order Granting Def.'s Mot. Withdraw Reference ("If the bankruptcy court determines that it is appropriate to grant
a dispositive motion, the bankruptcy court is directed to make a proper report and recommendation for consideration
by this court.").
[92] Pl.'s Mot. Partial Summ. J., ECF No. 93; Def.'s Mot. Summ. J., ECF No. 89.
[93] A bankruptcy court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to
adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.

bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  The Supreme Court has explained that "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.  A genuine issue of material fact is present when the evidence is such that a reasonable fact finder could return a verdict for the nonmovant. *Piazza's Seafood World*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When considering the summary judgment record, courts may not "weigh the evidence or make credibility determinations." *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018).  But the courts must, of course, decide what evidence warrants consideration. *Id.* (citations omitted).  Under Rule 56, a movant meets his initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990) (citations omitted).  But the movant "need not 'negate' the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citations omitted).  If the moving party meets his initial burden, then the burden shifts to the nonmovant to show that there is a genuine issue of material fact for trial. *Latimer*, 919 F.2d at 303.  And "the nonmovant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial." *Little*, 37 F.3d at 1075 (citation omitted).[94]

---

[94] *See also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment.").

Courts must view the facts "in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). The mere existence of a factual dispute is not enough to create a ***genuine*** and ***material*** dispute such that the nonmoving party may survive an otherwise properly supported summary judgment motion. *See id.* (citing *Liberty Lobby*, 477 U.S. at 247–48). Simply creating "some metaphysical doubt" as to the facts is insufficient: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Furthermore, a party may not offer declaration evidence that inexplicably impeaches sworn testimony, nor one that is internally inconsistent or self-contradictory. *See Hacienda Recs.*, 718 F. App'x at 235 (rejecting a declaration "that impeaches, without explanation, sworn testimony" (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996))); *Cooper Cameron Corp. v. U.S. Dep't of Labor*, 280 F.3d 539, 550 (5th Cir. 2002) (declining to consider a "self-contradictory affidavit"). Nor may a party present evidence that contradicts his own admissions in the pleadings in an effort to prevail on summary judgment. *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 136 F. Supp. 3d 792, 821 n.29 (S.D. Tex. 2015) (citing *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 107–08 (5th Cir. 1987)). Moreover, "it is not incumbent upon the court to comb the record in search of evidence that creates a genuine issue as to a material fact." *Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F. Supp. 3d 400, 403 (N.D. Tex. 2020) (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)). Rather, the nonmoving party has the duty of pointing to evidence that gives rise to a genuine dispute as to a material fact. *Celotex*, 477 U.S. at 324. Distilled to the core, "[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant."
*Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir. 1993) ("We no longer ask whether
literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the
strength of the record evidence, carry the burden of persuasion with a reasonable jury." (citing
*Liberty Lobby*, 477 U.S. at 251)).

## V.    **DISCUSSION**

As noted, the Plaintiff seeks to avoid and recover the aggregate $1.85 million of Settlement
Payments (i.e., thirteen payments in all) made to River North (sometimes referred to herein as the
"Challenged Funds").  Of this amount, $1,737,500 of the Settlement Payments were received by
River North prepetition, and are alleged to have constituted fraudulent transfers under both § 548
of the Bankruptcy Code, and §§ 24.005 and 24.006 of the Texas Business and Commercial Code
Uniform Fraudulent Transfer Act ("TUFTA")—the latter of which may be asserted by the Plaintiff
by virtue of Bankruptcy Code § 544(b).[95]  A single $112,500 Settlement Payment was received by
River North postpetition, without the Bankruptcy Court's authorization, so the Plaintiff seeks to
avoid that transfer, alternatively, under § 549(a) of the Bankruptcy Code.  The Plaintiff alleges that
the Debtors (i.e., the Debtor FMP SA) transferred the Challenged Funds in connection with the
River North Settlement either with actual fraudulent intent (Counts I–II), and/or did not receive
reasonably equivalent value in exchange for the transfers, while FMP SA was insolvent

---

[95] *See* 11 U.S.C. § 548(a)(1)(A) (actual fraudulent transfer); Tex. Bus. Orgs. Code § 24.005(a)(1) (actual fraudulent
transfer under TUFTA); 11 U.S.C. § 548(a)(1)(B) (constructive fraudulent transfer); Tex. Bus. Orgs. Code §§
24.005(a)(2), 24.006 (constructive fraudulent transfer under TUFTA).

(constructive fraud) (Counts III–V).[96]  As part of its lack of reasonably equivalent value or lack of consideration argument, the Plaintiff argues that FMP SA did not receive any benefit for entering into the November 30, 2015 Guaranty Assumption, wherein it first incurred obligations to River North.

In connection with the Plaintiff moving for summary judgment on his actual fraudulent transfer claims, in addition to asserting that numerous badges of fraud exist with regard to the Settlement Agreement, the Plaintiff emphasizes that the Settlement Agreement's ultimate result was simply that the four Owners acquired or realized more equity in the non-debtor parent, Alamo Furr's.  In other words, River North's 20% equity interest in the non-debtor Alamo Furr's was redeemed or liquidated—and it was done *with funds that should have been available to the bankruptcy estate*.  This, he says, constituted fraud.  The Plaintiff argues that either the *obligation* incurred by the Debtor FMP SA under the Settlement Agreement was a fraudulent transfer *or* the *separate payments made by it thereafter* were fraudulent transfers.

And, of course, the Plaintiff's actual fraud theory further revolves around the PPP loans. The Plaintiff stresses that the Fresh Enterprise (including two Debtors—Fresh and Buffets, LLC) received various federal loans through the PPP program, and wrongfully diverted $1,850,000 of those loan proceeds to the Debtor FMP SA, which then used those funds to make the River North Settlement Payments.  The Plaintiff claims that the misuse of PPP funds was a fraud on the United States Government, as well as on AB&T—the PPP lender and FMP SA's largest creditor.

---

[96] No requisite intent is necessary for the § 549(a) postpetition transfer—court authorization is the only relevant inquiry (Count VI).

River North denies these claims in full.  River North primarily advances the theory that there was no transfer of property of FMP SA or of any Debtor because the $1.85 million in Settlement Payments were either "earmarked" by non-debtor TXFMP for FMP SA to use for the River North Settlement (flowing in and out of the Operating Account of Debtor FMP SA ever-so-briefly on May 14, 2020, and then, into the Collateral Account where it was allegedly beyond FMP SA's ownership or control), or River North was the de facto owner of the funds at the time the Settlement Payments were actually received by it.

As detailed below, this Court believes partial summary judgment is appropriate for both parties on differing aspects.  First, the Court will focus on whether the funds ultimately transferred to River North were property of the Debtor FMP SA—that might have been available for its bankruptcy estate generally absent the Settlement Payments being made to River North and, assuming so, when the actual transfers should be deemed to have occurred.  The letter of credit structure undergirding the Settlement Agreement here is relevant, as is the funds-flow from the various entities along the way—including into and out of FMP SA's bank accounts.  Somewhat relevant is the fact that Settlement Payments were not made from letter of credit draws ever.  They were made from funds in the Collateral Account—funded from an FMP SA operating account. The Court will review certain Fifth Circuit jurisprudence involving letters of credit in bankruptcy, and the earmarking and de facto owner defenses that have been advanced in the context of preference suits.  Second, the Court will analyze the Plaintiff's actual fraudulent conveyance, constructive fraudulent conveyance, and postpetition transfer claims separately.  After all this, the Court concludes that (1) the $1.85 million in Settlement Payments paid out to River North was property of Debtor FMP SA; (2) summary judgment is not appropriate for either party on the actual fraudulent transfer claims—those claims should proceed to trial; (3) River North should be granted

summary judgment on the constructive fraudulent transfer claims; and (4) the Plan Trustee should be granted summary judgment on the single postpetition transfer.

### A. Property of the Estate: The Threshold Avoidance Action Requirement

First, this Court must determine whether ***any*** of the Settlement Payments were property of the Debtor FMP SA (i.e., property that would have been property of the FMP SA bankruptcy estate if not transferred). If not, then none of the Settlement Payments are avoidable.

Property of the bankruptcy estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The Supreme Court has stated that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). An avoidance action's threshold requirement is that "property of the debtor," "property of the estate," or "an interest of the debtor in property" be transferred within the relevant look-back period.[97] The conveyance of FMP SA's funds from its Operating Account, into the Collateral Account, and the thirteen Settlement Payments made from the Collateral Account thereafter, constitute separate instances of avoidable transfers of its property. *See* 11 U.S.C. § 101(54) ("transfer" is defined as virtually any mode, direct or indirect, of parting with property). As is discussed below, this Court holds that the $1.85 million in

---

[97] *See* 11 U.S.C. § 544(a) (trustee as lien creditor) ("[t]he trustee . . . may avoid any transfer of property of the debtor"); 11 U.S.C. § 547(b) (preferences) (the trustee may . . . avoid any transfer of an interest of the debtor in property"); 11 U.S.C. § 548(a)(1) (fraudulent transfers) ("[t]he trustee may avoid any transfer . . . of an interest of the debtor in property"); 11 U.S.C. § 549(a) (postpetition transactions) ("the trustee may avoid a transfer of property of the estate").

Challenged Funds constituted property of the Debtor FMP SA that would have become property of its bankruptcy estate had it not been transferred.

### 1. The Fifth Circuit case of **In re Compton Corp.** *provides the framework for evaluating letter of credit transactions in property of the estate inquiries.*

As previously noted, this adversary proceeding—and the Settlement Agreement at the heart of it—involves a letter of credit facility.  "A letter of credit, like a guarantee, is an irrevocable obligation that enables a party to a transaction to substitute the financial integrity of another in its stead."[98]  A letter of credit typically includes three parties:  "(1) the 'issuer' of the instrument (usually a bank); (2) the buyer/borrower, or 'applicant,' that purchases the instrument; and (3) the beneficiary in whose favor the letter of credit is written."[99]  This adversary proceeding involves a "standby letter of credit," which is when the issuer only makes payments under the letter of credit on the borrower's behalf when the borrower fails to perform under the contract between the borrower and the beneficiary of the letter of credit.[100]  Simply put, letters of credit are instruments used when parties to a transaction are concerned with their counterparty's ability to pay.  The letter of credit shifts counterparty risk from one party in the transaction (the beneficiary) to a third party (the issuer) who stands in the borrower's shoes.

---

[98] Kenneth Pasquale et al., *Treatment of Letters of Credit in Bankruptcy: A Primer*, Norton Ann. Surv. Bankr. L., Aug. 2019, at *1; *see also Alaska Textile Co. v. Chase Manhattan Bank, N.A.*, 982 F.2d 813, 815 (2d Cir. 1992) ("The commercial letter of credit . . . is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own.").

[99] Pasquale et al., *supra* note 98, at *1.

[100] *Id.* at *2; *see also Kellogg v. Blue Qual Energy, Inc. (In re Compton Corp.)*, 831 F.2d 590 (5th Cir. 1987) ("Under a standby letter of credit, the bank becomes primarily liable to the beneficiary upon the default of the bank's customer to pay [the beneficiary]."), *modified on other grounds on reh'g*, 835 F.2d 584 (5th Cir. 1988).  In contrast, in a "commercial" letter of credit transaction, the beneficiary looks to the issuer for payment—it does not first demand payment from the borrower.

Letters of credit feature two key principles: "strict compliance" and "independence."[101] The "strict compliance" principle simply means that the issuer is absolutely bound to advance funds under the letter of credit when conditions requiring payment under the facility are met.[102] The "independence" principle reflects the fact that "the issuer's obligation to pay the beneficiary under a letter of credit will be unaffected by the relative rights and obligations under any agreements or relationships between the beneficiary and the applicant or the issuer and the applicant."[103] The issuer is "independent" from the borrower—which is how the shifting of credit risk occurs. Thus, the issuer must pay the beneficiary under the terms of the letter of credit, even if the borrower is in bankruptcy.[104] The independence principle is the "cornerstone of letter of credit law" because "an issuer's obligation to the letter of credit's beneficiary is independent of any obligation between the beneficiary and the issuer's customer."[105]

Another important concept involved in letters of credit is subrogation, which generally refers to the "'the substitution of one party in place of another with reference to a lawful claim, demand or right,' and may be contractual, equitable, or statutory."[106] Article 5 of the Uniform Commercial Code governs letters of credit and provides that when an issuer advances funds, the issuer "is entitled to be reimbursed by the applicant in immediately available funds . . . ."[107] The

---

[101] Pasquale et al., *supra* note 98, at *2.
[102] *Id.*
[103] *Id.*
[104] *Id.*; *see also, e.g.*, *Sabratek Corp. v. LaSalle Bank, N.A. (In re Sabratek Corp.)*, 257 B.R. 732, 738 (Bankr. D. Del. 2000) (declining to issue a preliminary injunction that would delay a creditor's ability to draw on its letter of credit merely because the applicant had filed for bankruptcy).
[105] *Compton*, 831 F.2d at 590.
[106] *Mainas Farms, Inc. v. Vukasovich Tr. (In re VEC Farms, LLC)*, Ch. 11 Case No. 04-56545-JRG, B.A.P. No. NC-06-1230-BPaD, 2006 WL 6811014, at *2 (B.A.P. 9th Cir. Dec. 22, 2006) (quoting *Hamada v. Far E. Nat'l Bank (In re Hamada)*, 291 F.3d 645, 649 (9th Cir. 2002)).
[107] U.C.C. § 5-108 (Am. L. Inst. & Unif. L. Comm'n 2022).

issuer's right to reimbursement is typically contained in a reimbursement agreement between the issuer and borrower.[108]   Additionally, Article 5 of the Uniform Commercial Code states that when an issuer honors its obligation under the facility, the issuer is "subrogated to the rights of the beneficiary to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the beneficiary . . . ."[109]   And conversely, the issuer is also subrogated to the rights "of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant."[110]

An issuer's right of subrogation in a bankruptcy proceeding is provided in 11 U.S.C. § 509(a):  "[A]n entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."[111]   Critically, subrogation allows the issuer to "step[] into the shoes of the creditor-beneficiary to assert the creditor-beneficiary's claim against the debtor-applicant."[112]

With these concepts in mind, the Fifth Circuit analyzed a letter of credit in the context of a bankruptcy trustee's preference action in *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586 (5th Cir. 1987).   While *Compton* involved a preference action (as opposed to a fraudulent transfer action, such as we have in the case at bar),[113] it gives us some guiding

---

[108] Pasquale et al., *supra* note 98, at *7.
[109] U.C.C. § 5-117(a) (Am. L. Inst. & Unif. L. Comm'n 2022).
[110] *Id.*
[111] Courts have expressly held that § 509(a) provides letter of credit issuers with subrogation rights.  *See, e.g.*, *In re Condor Sys., Inc.*, 296 B.R. 5, 16 (B.A.P. 9th Cir. 2003) ("[A] co-obligor who pays a claim against the debtor is automatically subrogated to the rights of the creditor to the extent of the claim and may proceed on that basis.").
[112] Pasquale et al., *supra* note 98, at *7.
[113] This Court has wondered a bit why the Plaintiff did not bring a cause of action in this adversary proceeding for preference liability.  *See* 11 U.S.C. § 547.  The transfers of the Challenged Funds occurred more than ninety days before the Petition Date but within a year of the Petition Date.  Perhaps the Plaintiff determined that it would be difficult to establish that the Defendant might have been an "insider," so as to be vulnerable to a one-year reach back.

principles regarding what should or should not be deemed property of a debtor/estate in connection with a letter of credit transaction and when a transfer should be deemed to have occurred.

In *Compton*, a bankruptcy trustee sought to recover a transfer received by an unsecured vendor through a draw on a letter of credit, which letter of credit had been established for its benefit on the eve of bankruptcy. The bankruptcy court and the district court had found there to be no voidable preference, but the Fifth Circuit reversed. The specific facts were that Blue Quail Energy, Inc. had been a shipper (unsecured creditor) to the future Chapter 11 debtor, Compton Corporation. When Compton failed to pay Blue Quail on a large ($500,000+) antecedent debt, Compton was able to convince its secured lender Abilene National Bank (later known as MBank) to agree to issue an irrevocable standby letter of credit in Blue Quail's favor. Under the terms of the letter of credit, payment of up to $585,443.85 would be due to Blue Quail if Compton failed to pay Blue Quail this amount by a date certain. MBank received a promissory note payable by Compton on demand for $585,443.85. MBank did not need a security agreement to cover the letter of credit transaction because a prior security agreement between the bank and Compton had a "future advances" provision (and had been perfected as to a variety of Compton's assets through an earlier filing of several financing statements). The letter of credit on its face noted that it was for an antecedent debt due Blue Quail. The day after MBank issued the letter of credit in Blue Quail's favor, several of Compton's creditors filed an involuntary bankruptcy petition against Compton.

---

While the Defendant was a 20% owner of the ultimate parent of the Debtor Fresh, this might not have been enough to establish an "insider" status—particularly if it was, indeed, a passive investor—as it appears to have been—without voting rights.

Thereafter, MBank paid Blue Quail $569,932.03 on the letter of credit after Compton failed to pay Blue Quail.

In the ensuing bankruptcy case, the bankruptcy trustee for Compton did not contest the validity of MBank's secured claim against Compton's assets for the amount drawn under the letter of credit by Blue Quail. Instead, the trustee filed a complaint in the bankruptcy court against Blue Quail asserting that Blue Quail had received a preferential transfer under § 547 through the underlying letter of credit transaction. The trustee sought to recover $585,443.85 from Blue Quail pursuant to § 550. Note that the trustee was not attempting to set aside the postpetition payments by MBank to Blue Quail under the letter of credit draw; nor did the trustee claim the letter of credit or its proceeds constituted debtor's property. The trustee was instead challenging *the earlier transfer* in which Compton granted MBank an increased security interest in its assets *to obtain the letter of credit for the benefit of Blue Quail*. The trustee claimed that the direct transfer to MBank of the increased security interest on May 6, 1982, constituted *an indirect transfer to Blue Quail* which occurred one day prior to the filing of the involuntary bankruptcy petition and was voidable as a preference under § 547. The court stated that:

> When a debtor pledges its assets to secure a letter of credit, a transfer of debtor's property has occurred under the provisions of 11 U.S.C. § 547. By subjecting its assets to MBank's reimbursement claim in the event MBank had to pay on the letter of credit, Compton made a transfer of its property. The broad definition of 'transfer' under 11 U.S.C. § 101(50) [now § 101(54)] is clearly designed to cover such a transfer. *Overall, the letter of credit itself and the payments thereunder may not be property of debtor, but the collateral pledged as a security interest for the letter of credit is.* Furthermore, in a secured letter of credit transaction, the transfer of debtor's property takes place at the time the letter of credit is issued (when the security interest is granted) and received by the beneficiary, not at the time the issuer pays on the letter of credit.

*Compton*, 831 F.2d at 590–91 (emphasis added).

In summary, the Fifth Circuit held that the bankruptcy trustee in *Compton* could recover from Blue Quail, the beneficiary of the letter of credit, because Blue Quail received an ***indirect transfer of value*** at the time collateral was pledged to the lender on account of the letter of credit. The court stated that this result preserved the sanctity of letter of credit transactions and carried out the purposes of the Bankruptcy Code inherent in the preference statute. MBank, the issuer of the letter of credit, being just the intermediary through which the preferential transfer was accomplished, completely fell out of the picture and was properly not involved in the adversary proceeding. MBank did not receive any preferential transfer—it gave new value for the security interest—that "new value" being the issuance of the letter of credit. The court further stated that the purpose of the letter of credit transaction in the *Compton* case:

> was to secure payment of an unsecured antecedent debt for the benefit of an unsecured creditor. . . . The promised transfer of pledged collateral induced the bank to issue the letter of credit in favor of the creditor. The increased security interest held by the bank clearly benefitted the creditor [Blue Quail] because the bank would not have issued the letter of credit without this security. *A secured creditor was substituted for an unsecured creditor to the detriment of the other unsecured creditors.* We also hold, therefore, that the trustee can recover under 11 U.S.C. § 550(a)(1) the value of the transferred property from "the entity for whose benefit such transfer was made." In the case at bar, this entity was the creditor beneficiary, not the issuer, of the letter of credit even though the issuer received the direct transfer from the debtor. *The entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer.*

*Id.* at 594–95 (emphasis added).

In summary, according to the holding of *Compton*, it would appear that, in the case at bar, the structure of there being a letter of credit undergirding the Settlement Agreement did nothing to protect River North here. In *Compton*, even though Blue Quail was ***ultimately paid from a draw on a letter of credit—and this particular draw was directly from MBank, not Compton***—Blue Quail was still liable for a preference, with the court determining that a transfer of value from

Compton to Blue Quail actually occurred when the collateral for the letter of credit was posted. The Fifth Circuit stated that the entire purpose of the direct/indirect doctrine is to look through the form of a transaction and determine which entity actually benefitted from the transfer and when.[114] In the case here, under the holding of *Compton*, it would appear that River North received a benefit/transfer of value not simply when it received the thirteen Settlement Payments, ***but when the Collateral Account was funded securing the letter of credit***.  Prior to this moment in time, FMP SA was simply obligated on a mere unsecured claim owed to River North.  At the moment the Letter of Credit and Collateral Account were established, FMP SA was additionally obligated on a contingent secured claim to AB&T—i.e., a claim that was secured by $1.85 million of funds in the Collateral Account.  It was at that point that River North realized indirect value on its previous unsecured claim (by virtue of having a letter of credit to look to, which the Debtor FMP SA was only able to obtain, by pledging $1.85 million of cash collateral).

But this is not the end of the analysis.  Setting aside *Compton* and letters of credit for a moment, River North attempts to elude fraudulent transfer liability here by invoking the "earmarking" doctrine.  A similar defense called the "de facto owner" or "property held in trust" defense should also be analyzed, as the theory is discussed in the earmarking doctrine cases.  Pursuant to these defenses, River North argues that the $1.85 million of funds that went into the Collateral Account to secure the AB&T letter of credit were not ever truly property of Debtor FMP SA and, thus, are not properly the subject of an avoidance action.

---

[114] *Compton*, 831 F.2d at 595.  *Compton* summarized its holding by stating that "[t]he bankruptcy and district courts erred in failing to analyze properly the transfer of debtor's property that occurred when Compton pledged its assets to obtain the letter of credit.  This transfer consisted of two aspects:  the direct transfer to [the issuer] which is not a voidable preference for various reasons and the indirect transfer to [the beneficiary] which is a voidable preference."

### 2.   *River North attempts to invoke the earmarking doctrine.*

The "earmarking" doctrine is a judicially created equitable exception sometimes invoked in avoidance actions (or at least in preference actions).  It relates to the requirement that, for there to be an avoidable transfer, a transfer of ***debtor*** property must have occurred at least at some point.  The doctrine usually is invoked when there was "money loaned to a debtor by a new creditor to pay an existing debt to an old creditor" which is not to be considered a "transfer of an interest of the debtor in property."  *Caillouet v. First Bank & Tr. (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 347 n.3 (5ᵗʰ Cir. 2008) (citing *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir. 1986)).  In such an event, there is thought to be no diminution of property that would have become property of the bankruptcy estate.  There is only a loan and mere substitution of one creditor for another.

The two leading earmarking doctrine cases in the Fifth Circuit are the seminal case of *Coral Petroleum, Inc. v. Banque Paribas–London*, and *In re Entringer Bakeries, Inc.*  They were both § 547 preference actions.  The Fifth Circuit described the earmarking doctrine as follows:

> For the preference to be voided under section 547, *it is essential that the debtor have an interest in the property transferred **so that the estate is thereby diminished**.* If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed.  This type of transaction is referred to as "earmarking" . . . . The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily *because the assets from the third party were **never in the control of the debtor** and therefore payment of these assets to a creditor **in no way diminishes the debtor's estate***.

*Entringer*, F.3d at 348 (emphasis added) (quoting *Coral Petroleum*, 797 F.2d at 1355–56).

In *Coral Petroleum*, the facts were that Coral, which later became a debtor, borrowed $35 million from a lender, Paribas-Suisse, pursuant to a term loan.  This happened in August 1982.  When Coral obtained the loan, it gave the lender a general security interest in all its assets.  It also

executed a stock pledge of 65% of each of its subsidiaries.  An indirect subsidiary of Coral called Leeward (which was one of the entities whose stock was pledged) deposited $35 million of its own money at the time of the loan to serve as collateral for the loan to Coral.  The opinion referred to this as a "fiduciary deposit," made in the name of Paribas-Suisse, but at the direction and risk of Leeward.  Leeward "earned the interest and shouldered the risk of the deposit."  The opinion further states that Paribas-Suisse retained control of the funds at all times with respect to Coral and Leeward.

About nine months later (May 9, 1983), Coral informed the lender and Leeward that it had decided to prepay the loan (it appears from the opinion that the purpose of the loan and its structure had been for tax reasons that no longer were present).  On the same day, Leeward sent an electronic communication to a Nassau branch office of the lender, instructing the lender "to break its $35,000,000 fiduciary deposit" and to transfer this sum to a certain bank account that Leeward maintained at the lender's Geneva branch.  A few minutes thereafter, Leeward electronically communicated to the lender's Geneva branch, instructing it to transfer the $35,000,000 it would be getting into Leeward's account in Geneva into Coral's account at the lender's Geneva branch.  Also on the very same day, Coral electronically communicated to the lender directing that the incoming $35,000,000 be applied to repay its loan obligation to the lender.  On the very next day (May 10, 1983), the lender debited and credited Coral's account—and also Leeward's—at the lender's Geneva branch, in a simultaneous bookkeeping transaction in accordance with these instructions, thus paying off Coral's loan.  A few weeks later, on June 2, 1983, Coral filed Chapter 11.  The unsecured creditors' committee ("UCC") in the case sued the lender, asserting that it received a preference.  The Fifth Circuit affirmed decisions of the lower courts holding that there was no preference under § 547 of the Bankruptcy Code because the funds transferred (i.e., the $35

million) had merely been "earmarked" to repay Coral's underlying debt and Coral had no control over these funds.

Note that the UCC had argued that "when the deposit was placed into Coral's general account at Paribas-Suisse on May 10, Coral theoretically had general control over these funds for at least one "magic moment."   The UCC asserted that at this magic moment, Coral could theoretically have made payments to its general creditors (although it did not do so or attempt to do so).   Hence, the UCC argued, there was a preference.   The UCC claimed that the only instructions to be considered in connection with the repayment transaction were certain Leeward telexes which did not on their face restrict the Leeward collateral once it was placed in Coral's account solely for repayment of Coral's obligation to the lender, and that, therefore, there were no restrictions upon Coral other than a mere "understanding" that funds would be used to pay off the lender.

The Fifth Circuit did not accept this argument, noting that the Leeward collateral was at all times restricted for the security, and the eventual repayment, of Coral's loan.   The evidence also established that at all relevant times Paribas-Suisse maintained full control over the $35 million collateral and excluded any control whatsoever of these funds by Coral.   The court further noted:

> Here there was no magic moment—there were merely simultaneous bookkeeping entries reflecting the credit and debit to the Leeward account and to the Coral account.   The Coral account was credited and debited at the same time.   When the telexes were received, Paribas-Suisse already had, and continued to have, actual and lawful control over the Leeward account, pledged to secure the Coral loan.   No transfers or book entries were made until all the telexes were received, and Paribas-Suisse thus had, before any entry was made to show a credit to the Coral account, the full power and right to apply the funds in the Leeward account to the Coral loan, and it continued to have such right and power until those funds were so applied. *The funds were at all times under Paribas-Suisse's lawful control.*   No evidence was presented by the Committee that Coral *at any time had control over these funds, even for a moment.*

*Coral Petroleum*, 797 F.2d at 1360–61 (emphasis added).

In summary, the court refused to elevate form over substance in resolving the control question. Although the funds did touch Coral's general account before the bookkeeping transaction paying off the note, "at no time did [the debtor] have general control over the funds whereby it could independently designate to whom the money would go."[115] The Fifth Circuit agreed with the district court's conclusion that, although there was no evidence that the funds in the debtor's "general account" were subject to any restrictions on use, "to hold [that the debtor Coral] had general control over these funds [in Leeward's account] would be to entirely elevate form over substance."[116] The Fifth Circuit accordingly affirmed the district court's summary judgment entry for the defendant-transferee.[117]

Later in *Entringer*, the Fifth Circuit found certain facts distinguishable from *Coral Petroleum*'s scenario and held that the earmarking doctrine did not apply.[118] The facts were that the debtor Entringer had borrowed $180,000 from First Bank & Trust ("FBT"). It was an unsecured loan as to Entringer, but one of its principals gave a guaranty and pledged some collateral. This was short-term financing and later, Entringer obtained a long-term secured loan from Whitney Bank (funded on April 12) and, the next day, delivered a check to FBT to pay the FBT loan in full ($181,702). That check cleared on April 16. A few weeks later, in May, Entringer filed bankruptcy. The trustee sued FBT for a preference. The issue was whether FBT was paid off with property of the estate. Although the lower courts applied the earmarking doctrine as to

---

[115] *Coral Petroleum*, 797 F.2d at 1356.
[116] *Id.* at 1359.
[117] *Id.* at 1356.
[118] 548 F.3d at 350–51.

the amounts paid to FBT, they held that the value of the collateral pledged to Whitney ($74,381) was a preference to FBT in that amount.

On appeal, the Fifth Circuit held that the entire amount paid to FBT was a preference, stating that the money became Entringer's property on April 12 when Whitney deposited it into Entringer's general account, and Entringer paid FBT a day later.  The Fifth Circuit stated that this fact made the case distinguishable from *Coral Petroleum*, **wherein the debtor never once had any true control over the money**.  Instead of a simultaneous bookkeeping transaction as in *Coral Petroleum*, here the money remained in Entringer's account until Entringer chose to write a check to FBT the day after receiving the funds from Whitney.  Additionally, Entringer never stipulated to FBT that it would use the Whitney money to pay the FBT loan off, unlike in *Coral Petroleum*, where Coral told the lender to use the incoming money to satisfy Coral's debt.

The Fifth Circuit noted that, although physical control is not the sole indicator of whether parties earmarked money for a particular creditor, it is particularly relevant when there is control and there is no apparent agreement.  Because Entringer had control over the funds in question, the earmarking doctrine did not apply, and the trustee could avoid the entire payment to FBT as a preferential transfer.

*Entringer*'s earmarking analysis referred to the case of *In re Southmark Corporation*, where the Fifth Circuit "expounded upon what it means to 'control' funds."[119]  In essence, a debtor may not earmark his own funds.  *Entringer* described this qualification as follows:

> *If the debtor determines the disposition of funds* from the third party *and designates the creditor to be paid*, the funds are available for payment to creditors in general

---

[119] *Id.* at 349 (referring to *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1113–14, 1116 (5th Cir. 1995)).

and the funds are assets of the estate.  In this event, *because the debtor controlled the funds and could have paid them to anyone*, the money is treated as having belonged to [the debtor] for purposes of preference law whether or not [the debtor] actually owns it.[120]

In sum, in reconciling *Coral Petroleum* and *Entringer*, this Court concludes that earmarking is a bridge too far here.  FMP SA had control over the $1.85 million of funds as of the moment they went into its Operating Account on May 14, 2020.  It could not earmark its own funds.  Moreover, no one did or could have earmarked the funds for a litigation settlement (i.e., not TXFMP nor anyone else in the Fresh Enterprise) when the ultimate source of the funds had been PPP loans—for which a litigation settlement would have been a restricted use.  Moreover, courts have cautioned that the earmarking doctrine should be narrowly construed.  *See Wilmington Tr. Co. ex rel. Motors Liquidation Co. Avoidance Action Tr. (In re Motors Liquidation Co.)*, 596 B.R. 774, 781 (Bankr. S.D.N.Y. 2019) (citing 5 Collier on Bankruptcy ¶ 547.03[2][a] (16th ed. 2011)).

### 3.  *River North also asserts a similar de facto owner defense.*

Intermingled with River North's earmarking defense lies a similar theory—that theory being that the Settlement Payments were held in trust for the benefit of River North such that they were never property of the estate.[121]  This theory suggests that River North would be the "de facto owner" of the Challenged Funds.  A similar argument was considered and rejected in *Southmark.*

---

[120] *Id.* at 350 (emphasis added).

[121] The "de facto owner" or "property held in trust" theory is similar to the earmarking doctrine, but the Fifth Circuit has indicated they are different theories by addressing them separately.  *See Southmark Corp.*, 49 F.3d at 1115 n.8 ("[T]he record does not support a conclusion that the funds were either held in an express or resulting trust or earmarked.").  In this footnote, *Southmark* cites to *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1335–36 (5th Cir. 1993) (first rejecting a constructive trust defense, and additionally rejecting an earmarking defense); *Coral Petroleum*, 797 F.2d at 1357 (recognizing the earmarking doctrine for the first time in the Fifth Circuit, but never addressing an express or constructive trust argument); and *Harris v. Sentry Title Co.*, 715 F.2d 941, 946 (5th Cir. 1983) (discussing the

The facts of *Southmark* are worthy of discussion because it—like the case at bar—involved payments pursuant to a prepetition settlement agreement.  The debtor Southmark Corp. had hundreds of affiliates.  Joseph Grosz was an employee of two of its subsidiaries ("ARA" and "ART").  A dispute arose regarding his compensation, and the parties reached a prepetition settlement agreement.  Grosz received a $289,258.96 settlement payment that was drawn off an account owned by Southmark, but ARA was identified in certain documents as the payor.  There was some confusion regarding the identity of the entity that actually made the payment, because Southmark used a cash management system in its corporate enterprise wherein there was commingling of receipts and disbursements from the various entities in the enterprise in various accounts, but there was segregated recordkeeping.  In fact, at the time Grosz was paid his settlement, the entity that was obligated to him, ARA, had a positive balance in the cash management system.  Grosz's check was drawn on a general miscellaneous bank account referred to as the "Payroll Account."  Like other bank accounts in the cash management system, the account was in the name of and owned, operated, and controlled by Southmark.  Southmark used funds from the account to pay for its own obligations in addition to those incurred by affiliates and subsidiaries participating in the cash management system.

After Southmark filed bankruptcy, it later sought to recover, *inter alia*, the payment to Grosz, arguing that the transfer was a preferential payment and, thus, avoidable under § 547(b). Grosz filed a motion for summary judgment, arguing, among other things, that the funds with which he had been paid were not the property of Southmark's estate, so that the payment was not

---

requirements of a constructive trust (outside of the bankruptcy context)), *modified on other grounds*, 727 F.2d 1368 (per curiam), *cert. denied*, 467 U.S. 1226 (1984).

an avoidable preference.  The bankruptcy court agreed and dismissed Southmark's preference

claim—concluding that, even though Grosz was paid by check drawn on a bank account that was

owned by Southmark, there were no genuine issues of material fact presented, and that, as a matter

of law, the payment was from ARA's estate, not the estate of Southmark.  The district court agreed

and affirmed the bankruptcy court, but for a different reason.  The district court held that the funds

in Southmark's payroll account in the cash management system that were used to pay Grosz were

held in a "quasi trust" for the benefit of ARA.  The Fifth Circuit disagreed with both courts' legal

conclusions, reversing and remanding.  In doing so, the Fifth Circuit stated that the funds

transferred to Grosz indisputably belonged to Southmark:

> The check paid to Grosz was drawn on Southmark's Payroll Account, a general
> bank account containing commingled funds, to which Southmark held complete
> legal title, all indicia of ownership, and unfettered discretion to pay creditors of its
> own choosing, including its *own* creditors.  The last point is particularly important,
> as the primary consideration in determining if funds are property of the debtor's
> estate is whether the payment of those funds diminished the resources from which
> the debtor's creditors could have sought payment.  . . . Furthermore, as Grosz has
> not demonstrated that the money that he received from Southmark's Payroll
> Account was held—or should be deemed to have been held—in trust for ARA by
> Southmark, we conclude, as a matter of law, that based on the undisputed facts,
> those funds are the property of Southmark's estate for the purposes of § 547(b).  . .
> . For the purposes of preference law, therefore, the money in Southmark's Payroll
> Account is treated as part of Southmark's estate, whether or not Southmark actually
> owns it.

*Southmark*, 49 F.3d at 1116–17 (emphasis in original).

The de facto owner defense runs parallel to the earmarking doctrine:  If the third-party

transferee (here, River North) somehow held equitable title to the funds at issue, and FMP SA only

held legal title as trustee for River North's benefit, then the funds cannot appropriately be

considered property of the estate.  *See Southmark*, 49 F.3d at 1117 ("[I]f funds cannot be used to

pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for

preference purposes.  A common example is when a debtor holds funds in trust for another."

(citations omitted)).  The Fifth Circuit has recognized that § 541(d) excludes from the estate such

property held by the debtor in trust for another's benefit.  *Southmark*, 49 F.3d at 1117 (first citing

*Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 436 (5th Cir. 1994) ("[Section]

541(d) accords the beneficiary of a constructive trust, properly imposed under state law, the right

to recover the trust property from the bankruptcy trustee or the debtor."); and then citing *Evans*

*Fur Co. v. Chase Manhattan Bank, N.A. (In re Sakowitz)*, 949 F.2d 178, 181 (5th Cir. 1991)

("[P]roperty held in trust for another is not property of the estate under 11 U.S.C. § 541 in the

event of the trustee's bankruptcy." (citing *Begier*, 496 U.S. at 110))).  The Fifth Circuit, in

reversing the lower courts in *Southmark*, found error in their decisions because they failed to first

determine that non-debtor ARA held an equitable property interest in the funds paid to Grosz from

Southmark's account.[122]  The court began its analysis by stating:

> At the outset, it is important to distinguish generally between two types of
> "equitable interests."  In a contractual (or debtor-creditor) relationship, the creditor
> may possess an "equitable claim" to property actually owned by the debtor, but
> there is no division of ownership or title in the property at issue; the debtor is
> entirely free to dispose of the property as he sees fit.  In a trust relationship, by
> contrast, the law actually divides the bundle of rights in the property; the trustee
> holds legal title while the beneficiary possesses an equitable title or property
> interest.  *Only in the latter instance—when legal title to the property is held by the*
> *bankrupt in trust for the benefit of another—is the property properly excluded from*
> *the bankrupt's estate* under preference law.[123]

---

[122] *Id.* at 1117.  Specifically, the court found error as follows:  "Although the district court likely believed that
substantial justification for imposing a constructive trust existed here, the court was still required to apply state law to
ascertain whether (1) ARA was entitled to the benefit of that equitable remedy, and (2) the remedy could be properly
fashioned from the facts and within the confines of the Bankruptcy Code.  The court failed to do either."  *Id.* at 1119.
[123] *Id.* at 1117–18 (emphasis added) (first citing generally George G. Bogert & George T. Bogert, *The Law of Trusts*
*and Trustees § 17*, at 216–17 (2d rev. ed. 1984) (explaining the distinction between the two "equitable interests"); and
then citing *Monnig's Dep't Stores, Inc. v. Azad Oriental Rugs, Inc. (In re Monnig's Dep't Stores, Inc.)*, 929 F.2d 197,
202 (5th Cir. 1991) (holding that the district court erred in imposing a constructive trust where a debtor-creditor
relationship existed—not a trust relationship)).

Thus, property should be excluded from the estate only when an express or constructive trust is in place.[124]

Because the de facto owner theory asserts that a trust exists for the claimant's benefit, the burden of proof lies on the defendant-transferee. *In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1335 (5th Cir. 1993) ("When the property of an estate is alleged to be held in trust, the burden of establishing the trust's existence rests with the claimants.").[125]   And "[w]hen the movant bears the burden of proving an affirmative defense at trial, 'it must establish beyond dispute all of the defense's essential elements.'"   *Soto v. William's Truck Serv., Inc.*, No. 3:11-CV-3242-B, 2013 WL 487070, at *1 (N.D. Tex. Feb. 8, 2013) (first quoting *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006); and then citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).   Furthermore, the claimant's burden of showing an express trust is not an easy one.   *Sakowitz*, 949 F.2d at 181 ("[T]he words 'held . . . in trust' in the sublease do not in and of themselves suffice to establish an express trust.   It is well established that '[i]f a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests.'" (quoting *In re Morales Travel Agency*, 667 F.2d 1069, 1072 (1st Cir. 1981))).

Together with express trusts, Texas law also recognizes constructive trusts.   But *Southmark* observed that "[u]nder Texas law, a constructive trust is not actually a trust, but rather an equitable

---

[124] *See Southmark*, 49 F.3d at 1117–18.
[125] *Accord Southmark*, 49 F.3d at 1118; *Haber Oil Co.*, 12 F.3d at 435–36; *see also* 4 Collier on Bankruptcy, § 541.13, at 541–76 to –78 (15th ed. 1993).

remedy imposed by law to prevent unjust enrichment resulting from an unconscionable act."[126] Thus, the Fifth Circuit has repeatedly held that actual or constructive fraud must be present to justify imposing a constructive trust.[127]   The rationale for such a high bar is rooted in preventing state law from upending the Bankruptcy Code's priority scheme.  *Southmark* recognized that "the imposition of a constructive trust is a potent remedy, as it gives the successful claimant priority over the debtor's unsecured creditors; thus such a trust should not be imposed 'cavalierly' in a bankruptcy proceeding."[128]

At bottom, the Fifth Circuit has summarized the required elements for imposing a constructive trust under Texas law:  "(1) breach of a fiduciary relationship or, in the alternative, actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing of the property to an identifiable res."[129]

---

[126] *Southmark*, 49 F.3d at 1118 (first citing *Haber Oil Co.*, 12 F.3d at 436; and then citing *Sw. Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 810 (Tex. Civ. App.—San Antonio 1994, writ denied).

[127] *Id.*; *see also Expl. Co. v. Vega Oil & Gas Co.*, 843 S.W.2d 123, 127 (Tex. Civ. App.—Houston 1992, writ denied); *Haber Oil Co.*, 12 F.3d at 436–37 (noting that a constructive trust remedy is justified under Texas law generally in two circumstances:  actual fraud or breach of a confidential or fiduciary relationship); *In re Carolin Paxson Advert., Inc.*, 938 F.2d at 597 (and cases cited therein) ("A constructive trust generally arises when a person with legal title to property owes equitable duties to deal with the property for the benefit of another.  Under Texas law, such a trust may be imposed when one obtains property by fraudulent means, when an absolute conveyance of property was performed but not intended, or when a party breaches a fiduciary-like relationship." (citations omitted)).

[128] 49 F.3d at 1118.  The court cited to *Haber Oil Co.*, where the Fifth Circuit explained the problems associated with imposing constructive trusts for certain creditors.  "The remedy of a constructive trust is . . . a potent one in bankruptcy because it gives the successful claimant 'priority over the defendant's unsecured creditors' to the extent of the property subject to the trust.  As a result, creditors of the bankrupt debtor have every incentive to argue that their unsecured claims are eligible under state law for the remedy of a constructive trust.  Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant to impose constructive trusts without a substantial reason to do so."  *Haber Oil Co.*, 12 F.3d at 436 (citations omitted).

[129] *Id.* at 1118 n.31; *Haber Oil Co.*, 12 F.3d at 437 (first citing *Monnig's Dep't Stores*, 929 F.2d at 201; and then citing *Rosenberg v. Collins*, 624 F.2d 659, 663 (5th Cir. 1980) (holding that, under Texas law, a constructive trust can attach only "to some identifiable property which can be traced back to the original property acquired by fraud" (internal quotations omitted))).

### B.  Whether the Settlement Payments Were Property of the Debtor FMP SA That Would Have Become Property of the Bankruptcy Estate

The principles from the earmarking and de facto owner cases must now be joined with those from *Compton.*  While these cases and *Compton* dealt with alleged preferences, their principles and reasoning can be expanded to the context of fraudulent transfers and postpetition transfers.[130]  In all of these situations, there is a threshold requirement that the transfers involved were of property in which the debtor or estate held an interest.

Control of the relevant accounts, use restrictions, security interest dynamics, and commingling/tracing of funds are all issues.  *Compton* took care not to disturb the letter of credit marketplace, while also preventing abuse of the Bankruptcy Code.  This Court seeks to do the same here.  With all of the relevant Fifth Circuit precedent in mind, this Court first concludes as a matter of law, based on the summary judgment evidence, that ***property of FMP SA was transferred to or for the benefit of the Defendant of River North at least on May 14, 2020***.  This was when $1.85 million of funds were transferred from the FMP SA Operating Account to the FMP SA Collateral Account.

As noted in *Compton,* if an existing unsecured creditor becomes the beneficiary in a letter of credit transaction, and the transaction's result is to transfer value out of the debtor (i.e.,

---

[130] *See, e.g.*, *Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391, 398 (Bankr. E.D.N.Y. 1997) ("[T]he rationale of the earmarking doctrine is equally applicable to actions under both § 547(b) and § 549(a)"."); *Herzog v. Sunarhauserman (In re Network 90°, Inc.)*, 98 B.R. 821, 837 (Bankr. N.D. Ill. 1989) (same), *aff'd*, 126 B.R. 990 (N.D. Ill. 1991); *Peoples Bank & Tr. Co. v. Burns*, 95 F. App'x 801, 805 (6th Cir. 2004) ("Although the earmarking doctrine has not been applied to post-petition transfers in the Sixth Circuit, other courts have so expanded its application . . . ."); *Motors Liquidation Co.*, 596 B.R. at 781 (opining that although there was "no precedent for applying the earmarking doctrine to a postpetition transfer of DIP loan proceeds," the court reasoned that the "lack of precedent does not, in itself, doom the Term Lenders' argument," but declined to apply the doctrine on the facts).

collateral) to support that letter of credit, the previous mere unsecured creditor has received an indirect transfer—a benefit—at the expense of other similarly situated creditors. An unsecured claim may not be transformed into a secured claim to the detriment of other creditors. This is precisely what happened here. River North received an indirect transfer of $1.85 million of property of the Debtor FMP SA, on May 14, 2020, when funds in that amount were transferred from the FMP SA Operating Account to the FMP SA Collateral Account.

### 1. The de facto owner defense is unavailable.

The de facto owner defense can be easily dispatched here. River North has created no fact issue—nor has it established as a matter of law—that: (a) an express trust existed for River North's benefit; or (b) a constructive trust should arise in favor of River North; or (c) that it can trace any funds allegedly held in trust for it. River North bears the burden of demonstrating that the $1.85 million in question was held in trust for River North's benefit. *See Southmark*, 49 F.3d at 1118. And state law determines the extent of a debtor's interest in property, including whether property is held in trust. *See Oxford Mgmt.*, 4 F.3d at 1336.[131]

---

[131] *Oxford Management* stated that "[s]ection 541 defines those interests of the debtor that are transferrable to the debtor's estate, but it leaves to state law the task of defining the extent of the debtor's interest." 4 F.3d at 1336 (citing 4 Collier on Bankruptcy ¶ 541.02[1], at 541–10.1 to –13 (15th ed. 1993)). The court rejected the defendant-transferee's earmarking and constructive trust theories because "Louisiana does not recognize constructive trusts." *Id.* (citation omitted); *see also Southmark*, 49 F.3d at 1118 (stating that "[w]e look to state law to determine whether a party has adequately demonstrated that property is held in constructive trust for another," and applying Texas law); *see also, e.g., Ga. Pac. Corp.*, 712 F.2d at 969 (applying Arkansas and Mississippi law); *Monnig's Dep't Stores*, 929 F.2d at 201 (applying Texas law); *but see Haber Oil Co.*, 12 F.3d at 435 ("The states can therefore have some effect on the operation of the federal bankruptcy system by exercising their power to define property rights. We have emphasized that '[s]tate law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities.'" (quoting *Vineyard v. McKenzie (In re Quality Holstein Leasing)*, 752 F.2d 1009, 1014 n.10 (5th Cir. 1985))); *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 995 (Bankr. S.D. Ohio 1991) ("Customarily, the existence and nature of the debtor's interest in property are determined by state law. However, state law must be applied in a manner consistent with federal bankruptcy law." (citations omitted)).

River North cannot meet its burden of showing that an express trust exists under Texas law.[132]  There is no evidence of an express trust having been created when FMP SA received the Challenged Funds into its Operating Account from TXFMP.  And, as for when the Challenged Funds were transferred into the Collateral Account, the only trust-like language anywhere in the AB&T documents occurs in reference to proceeds of collateral inuring to FMP SA, which "shall be held by Grantor in trust for Lender . . . ."[133]  This language is typical in a security agreement and is in no way indicative of an express trust relationship between FMP SA and River North.  If anything, a trust-like relationship would arise between FMP SA and AB&T.

Without an express trust, Texas law only permits the imposition of a resulting or constructive trust as a remedy for prior wrongdoing.  River North has presented no summary judgment evidence on this theory either.  In fact, River North's position is that FMP SA was making perfectly above-board Settlement Payments on an antecedent debt—not court ordered payments to remedy a past fraud.  At the very least, River North is judicially estopped from now arguing that constructive fraud occurred to reach its desired legal result.

---

[132] Texas law should apply to this question when the relevant transactions are viewed in totality.  FMP SA, the transferor, is a Texas limited liability company—the Plan Trustee is standing in its shoes here.  The Settlement Agreement and resulting payments involve the liquidation of River North's interest in Alamo Furr's, which is also a Texas limited liability company.  And the Challenged Funds that arrived in FMP SA's Operating Account were transferred from TXFMP, which is another Texas limited liability company.  That said, AB&T (where all the involved bank accounts were located) is an Arizona bank, and the AB&T documents have an Arizona choice of law provision.  But the choice of law provision is only controlling in a dispute between AB&T and its counterparties.  Moreover, although River North is an Illinois limited liability company and the recipient of the Challenged Funds, the trust issue here involves River North's assertion that the $1.85 million transferred from one Texas limited liability company to another (TXFMP to FMP SA) was held in trust for River North's benefit.  Thus, while River North was formed in Illinois, thereby potentially implicating Illinois trust law, the "dominant contact" with the funds is the state of Texas, so Texas law applies to the trust issue.  *See In re Carolin Paxson Advert., Inc.,* 938 F.2d 595, 597 (5th Cir. 1991).

[133] Def.'s App. 282 (Collateral Assignment).

Lastly, since there is no summary judgment evidence of an express or constructive trust, the tracing exercise that would be required under a trust theory becomes irrelevant. As a matter of law, based on the summary judgment record, there was nothing more than a debtor-creditor relationship between River North and FMP SA—not a trust. River North cannot demonstrate that it is the de facto owner of the Challenged Funds at any point in time.

### 2. *The earmarking doctrine does not apply.*

It appears that the earmarking doctrine is alive and well in the Fifth Circuit.[134] But it is likewise unavailing to River North here. River North focuses extensively on control—and FMP SA's alleged lack of control over the Collateral Account—arguing that AB&T had exclusive control over the funds in the Collateral Account used to make the Settlement Payments. River North urges this Court to apply a "control test" provided by the Eleventh Circuit.[135] This test would simply require the Court to step back and evaluate the totality of the circumstances to ensure that the conclusions reached are logical and equitable.[136] The Eleventh Circuit created the test because "[t]he issue which troubled our court was not whether the property went *to* the alleged

---

[134] *Entringer* observed that *Coral Petroleum* recognized the earmarking doctrine in the Fifth Circuit, and no Supreme Court decision—nor the Fifth Circuit sitting *en banc*—has ruled otherwise. F.3d at 349. This includes *Begier v. IRS*, where the Supreme Court clarified the definition of "property of the debtor," stating that an avoidance action may lie against "property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." 496 U.S. at 58. *Entringer* stated that *Begier*'s characterization of "property of the debtor" was "virtually the same definition that we used in *Coral Petroleum*." F.3d at 349. Thus, "*Begier* did not overrule *Coral Petroleum* or the viability of the earmarking doctrine" in the Fifth Circuit. *Id.* Following this in a footnote, the court found support for the doctrine's continued survival because other circuits continued to apply it after *Begier* was decided. *Id.* at 349 n.4 (first citing *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 185 (2d Cir. 2007); then citing *Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1007–08 (9th Cir. 2000); and then citing comparatively *Manchester v. First Bank & Tr. Co. (In re Moses)*, 256 B.R. 641, 651 (B.A.P. 10th Cir. 2000) (holding that the earmarking doctrine "should not be extended beyond codebtor cases")).

[135] *Nordberg v. Sanchez (In re Chase & Sandborn Corp.)*, 813 F.2d 1177 (11th Cir. 1987) ("Chase & Sandborn I"), which was reaffirmed and applied in *Nordberg v. Societe Generale (In re Chase & Sandborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988) ("Chase & Sandborn II")).

[136] *Chase & Sandborn II*, 848 F.2d at 1199.

transferee, but whether it came *from* the debtor, the alleged transferor."[137]   The Eleventh Circuit recognized that "although the debtor corporation had possession of the funds in controversy by virtue of the transfer to the account . . . the debtor corporation did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation's property."[138]

River North also contends that the fact that the Settlement Payment funds went in and out of Debtor FMP SA's Operating Account, and into the Collateral Account the very same day (staying in FMP SA's Operating Account for, essentially, a "magic moment," as discussed in *Coral Petroleum*) suggests a lack of control by FMP SA over the funds.   This Court thinks River North misses the mark.   Value was depleted from the Debtor FMP SA at the time the Collateral Account was put in place, as further explained below.   And there is no summary judgment evidence suggesting that FMP SA had no control when it acted in that "magic moment" and transferred the Challenged Funds into the Collateral Account.

FMP SA did, indeed, have control over the Challenged Funds.   There is no summary judgment evidence to suggest that FMP SA did not have total control over its Operating Account.   For example, there was a lack of any ***binding*** instructions from TXFMP to FMP SA or to AB&T (i) to forward the $1.85 million from the Operating Account to the Collateral Account; and (ii) to then have AB&T effectuate the Settlement Payments to River North.   As was the case in

---

[137] *Chase & Sandborn II*, 848 F.2d at 1119 (emphasis in original).
[138] *Chase & Sandborn I*, 813 F.2d at 1180.   The Eleventh Circuit justified the "control test" as "consistent with the equitable concepts underlying bankruptcy law." *Id.* (citing *Bank of Marin v. England*, 385 U.S. 99, 103 (1966), which noted that "equitable principles govern the exercise of bankruptcy jurisdiction").   The court assured that it was "not creating new law, or even expanding on the existing doctrine." *Id.*   "Bankruptcy courts considering the question of whether a defendant is an initial transferee have traditionally evaluated that defendant's status in light of the entire transaction.   And, in the past, courts have refused to allow trustees to recover property from defendants who simply held the property as agents or conduits for one of the real parties to the transaction." *Id.* at 1199–1200.

*Southmark*, it cannot be disputed that when the funds came into the Operating Account, FMP SA had "complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its *own* creditors." *See Southmark*, 49 F.3d at 1116 (emphasis in original). It cannot be disputed that the funds were under FMP SA's control—even if "only for a few fleeting moments." *See Suburban Motor Freight*, 124 B.R. at 997; *cf. Coral Petroleum*, 797 F.2d at 1361 ("The funds were at all times under [the prepetition secured lender's] lawful control. No evidence was presented by the Committee that Coral at any time had control over these funds, even for a moment."). Because FMP SA "could have done anything it wanted to do with the money" when it arrived in the Operating Account, the Challenged Funds were not "clearly earmarked" for River North. *See Entringer*, 548 F.3d at 348, 350.

As earlier noted, this indisputable fact is reinforced by the lack of binding instructions to forward the assets from the Operating Account to the Collateral Account. If such evidence existed, that would signal FMP SA's lack of control. *See Ga. Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 971–72 (5th Cir. 1983) (stating that funds are not property of the estate if an irrevocable agreement compels the debtor to use money lent exclusively for a particular creditor's benefit).[139] And a distinction must be drawn between the "automatic" bank instructions on the Collateral Account (emphasized by River North) and "binding" instructions requiring FMP SA to forward the assets from the Operating Account to the Collateral Account. For example, *Entringer* stated

---

[139] *See also Auto-Train Corp.*, 810 F.2d at 274 (first citing *Morales Travel Agency*, 667 F.2d at 1071; then citing *Mid-Atlantic Supply, Inc. v. Three Rivers Aluminum Co.*, 790 F.2d 1121, 1126–27 (4th Cir. 1986); and then citing *Ga. Pac. Corp.*, 712 F.2d at 971–72) (discussing the "property held in trust" defense, stating that "courts have uniformly required a contract irrevocably obligating the debtor both to segregate the 'trust funds' from the debtor's own funds and to deliver the 'trust funds' to the creditor.").

that "[a]lthough physical control is not the sole indicator of whether the parties earmarked the money for a particular creditor, it is particularly relevant given that there was no agreement among Entringer, Whitney, and FBT that Entringer would use the money to pay off FBT."[140]  The Fifth Circuit added an important footnote:

> That Whitney, in a Credit Memorandum, stated that it believed Entringer would use the loan proceeds, combined with other loans Entringer was receiving, to pay off the FBT loan is of no moment. *Whitney's **unilateral belief** that Entringer was **planning** to use its money for the FBT debt is not the same as Entringer's **not having control**" to do as it wished with the money once the money entered its general account.

*Entringer*, 548 F.3d at 350 n.6 (emphasis added).

Although the summary judgment evidence confirms that the Collateral Account was set up with the express purpose of facilitating the Settlement Payments, the record here is devoid of any evidence suggesting that FMP SA was bound to forward the assets from the Operating Account to the Collateral Account.  The facts here do not suggest that the Challenged Funds were "clearly earmarked," especially because a debtor may not earmark his own assets.  *See Coral Petroleum*, 797 F.2d at 1356.

### 3.  *Compton does not allow River North's desired result.*

At bottom, this Court believes that applying the earmarking doctrine here defies *Compton*. This case is factually analogous to *Compton*, so it must end in the same result.  At the very least, a conveyance of an interest in estate property occurred when FMP SA transferred the $1.85 million in its Operating Account into the Collateral Account to secure AB&T's Letter of Credit to facilitate the Settlement.  Here, when the Court views the transaction as a whole, "but for" the Letter of

---

[140] 548 F.3d at 350.

Credit transaction, River North would have been an unsecured creditor holding an unsecured litigation/settlement claim. Due to the transaction, however, River North emerged as a beneficiary of AB&T's increase in security under the Letter of Credit and the Collateral Assignment—because AB&T was poised to step into the shoes of FMP SA if required. This is precisely what *Compton* addresses. Had the transaction not occurred, River North would have been extracting estate assets that otherwise would have been available to similarly situated unsecured creditors. The Letter of Credit transaction effectively upgraded River North's debt from an unsecured status to a secured one—due to AB&T's potential subrogation of FMP SA's rights and obligations if it were called on to pay from its own funds under the facility.

In sum, the $1.85 million of Challenged Funds constituted property of the Debtor FMP SA—at least at a point in time on May 14, 2020—and would have become property of the FMP SA bankruptcy estate, absent the subsequent transfers to the Collateral Account, and then onto River North. It appears to the Court, from the summary judgment record and from the discussed case law, that the Debtor FMP SA even continued to have a property interest in the Challenged Funds during the time they were in the Collateral Account, since one cannot earmark its own funds and there was no evidence of a trust or de facto ownership in favor of River North. Neither the earmarking doctrine nor the de facto owner defense applies. Accordingly, this Court holds that the Challenged Transfers were property of the Debtor FMP SA and thereby are subject to avoidance.

### C. Resolving the Competing Motions for Summary Judgment

With the $1.85 million in Settlement Payments established as property that belonged to the Debtor FMP SA and that might be subject to avoidance, the Court can now further assess the Plan Trustee Plaintiff's causes of action. As noted earlier, this Court recommends that the District Court (1) deny both Motions for Summary Judgment on the actual fraudulent transfer claims; (2) enter

summary judgment for River North on the constructive fraudulent transfer claims; and (3) enter summary judgment for the Plan Trustee on the single postpetition transfer.

### 1. *The actual fraudulent transfer claims should proceed to trial.*

Both parties move for summary judgment on actual fraud. The Plaintiff's actual fraudulent transfer claims under § 548(a)(1)(A) and TUFTA § 24.005(a)(1) (available to the Plaintiff under 11 U.S.C. § 544) should not be decided on the present record. A genuine dispute of material fact exists as to FMP SA's fraudulent intent such that pretrial adjudication is improper.

There are two distinct categories of potentially fraudulent activity to assess here. The first is alleged fraud in connection with the Guaranty Assumption (which was a transaction that happened back in 2015), which the Plaintiff hopes to establish was a fraudulently incurred obligation imposed upon FMP SA—that culminated in the Settlement Agreement and the Settlement Payments. The second category is alleged fraud and illegality in connection with the PPP loans. River North advances various arguments against fraudulent intent. In the end, genuine disputes of material fact exist that must be resolved at trial.

The precursor elements to a § 548 and a TUFTA actual fraudulent transfer claim are established here—that a transfer of estate property occur within two or four years of the petition date, respectively.[141] The remaining issue is whether FMP SA had actual intent to hinder, delay, or defraud a creditor when it facilitated the Settlement Payments.[142] Proving actual intent often turns on "badges of fraud," which provide circumstantial evidence of fraudulent intent. *See In re*

--------

[141] 11 U.S.C. § 548(a)(1); Tex. Bus. & Comm. Code §§ 24.005(a), 24.010(a)(1).
[142] 11 U.S.C. § 548(a)(1)(A); Tex. Bus. & Comm. Code § 24.005(a)(1).

*Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008); TUFTA § 24.005(b).  The Fifth Circuit has (non-exhaustively) recognized several badges of fraud when analyzing § 548 fraudulent transfers:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.[143]

Running parallel, TUFTA (non-exhaustively) lists eleven badges of fraud:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[144]

The Fifth Circuit has stated that "[n]ot all, or even a majority, of the 'badges of fraud' must exist to find actual fraud.  Indeed, "[w]hen several of these indicia of fraud are found, they can be a proper basis for an inference of fraud."  *Soza*, 542 F.3d at 1067 (quoting *Roland v. United States*, 838 F.2d 1400, 1403 (5th Cir. 1988)).  "Additionally, a court may consider other factors relevant

---

[143] *See Soza*, 542 F.3d at 1067 (first citing *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989) (quoting *Schmit v. Schmit (In re Schmit)*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)); then citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991); then citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983); then citing *FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 940 (Bankr. N.D. Tex. 1997); then citing *In re Moore*, 177 B.R. 437, 442 (Bankr. N.D.N.Y. 1994); and then citing *Beckman v. Staats (In re Beckman)*, 104 B.R. 866, 870 (Bankr. S.D. Ohio 1989)).
[144] *See* Tex. Bus. & Comm. Code § 24.005(b).

to the transaction." *Off. Comm. Unsecured Creditors Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) (citing *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198–99 (Bankr. D.N.J. 2006)). And federal courts have granted summary judgment when several badges are shown. *See, e.g.*, *BMG Music v. Martinez*, 74 F.3d 87, 90–91 (5th Cir. 1996) (affirming summary judgment under TUFTA based on six badges of fraud).[145]  That said, because many badges of fraud involve overlapping facts (as is the case here), the quantity of badges present is not as relevant as their appropriate weight or seriousness.

### i.   Alleged fraud in connection with the Guaranty Assumption

To begin, a line must be drawn between transactions, agreements, and/or payments that are avoidable—and those that are not. The Plaintiff's actual fraud-focus seems aimed collectively (or alternatively) at three sets of transactions: the obligation incurred by FMP SA under the Guaranty Assumption; the obligation incurred by FMP SA under the Settlement Agreement; and the transfers of property made by FMP SA via the Settlement Payments. But only the Settlement Agreement and the Settlement Payments are subject to attack—the obligation incurred under the Guaranty Assumption is not. This is because of the maximum four-year look-back period under TUFTA.

As a reminder, the Petition Date was April 20, 2021. The Settlement Agreement was executed on May 13, 2020, which was well within the two- and four-year reach back periods of § 548 and TUFTA § 24.005, respectively. Thus, FMP SA incurred its obligation thereunder under

---

[145] *Accord Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 238–39 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008) (affirming summary judgment based on five badges of fraud).

the applicable reach-back periods.  Thus, the Settlement Agreement itself is eligible for attack as either actually or constructively fraudulent.  The subsequent Settlement Payments made pursuant thereto are also eligible for avoidance, as the Challenged Funds from which they were made were transfers of property of the Debtor FMP SA made within the two- and four-year reach back periods of § 548 and TUFTA § 24.005.  That said, the Guaranty Assumption occurred on November 30, 2015—when FMP SA replaced BIII as obligor on River North's preferred return, with a subsequent default giving rise to the River North Litigation and the Settlement Agreement.  The Guaranty Assumption itself is not subject to avoidance, even if its incurrence were actually or constructively fraudulent, as it is beyond the maximum four-year look-back period.  The statute of repose under TUFTA has run as to the obligation incurred under the Guaranty Assumption.

But just because the Guaranty Assumption is not subject to avoidance does not mean this Court is required to disregard the circumstances.  This is due to the close nexus between the facts underlying the Guaranty Assumption and those underlying the Settlement Agreement:  "But for" the former, the latter would not have occurred.

Turning to whether actual fraudulent intent was present when FMP SA made the Settlement Payments, the Plaintiff asserts that at least nine badges of fraud are present.[146]  But this Court sees merit in focusing on the two most critical badges in this context, although other badges may also overlap.  The first relevant badge of fraud is the "pendency or threat of suits by creditors," and the parallel concept that "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit . . . ."[147]  The second relevant badge of fraud is that "the transfer

---

[146] *See* Pl.'s Mem. L. Supp. Mot. Partial Summ. J. 34–37, ECF No. 94 (arguing the presence of nine badges of fraud).
[147] *Soza*, 542 F.3d at 1067; Tex. Bus. & Comm. Code § 24.005(b)(4).

occurred shortly before or shortly after a substantial debt was incurred . . . ."[148]  These badges of fraud may demonstrate whether fraudulent intent should be extended from the Guaranty Assumption all the way through to the Settlement Agreement.

As for the badge of fraud regarding the incurrence of an obligation under threat of litigation, FMP SA's obligations under the Settlement Agreement were of course incurred as a direct result of pending litigation.  The "transfer under threat of litigation" badge of fraud typically speaks to situations where the debtor appears to transfer estate property to hide the asset—thereby hindering, delaying, or defrauding judgment creditors.  The facts here show the opposite:  The Settlement Payments were paid *to the creditor*—not in attempt to *evade* that creditor.

But this is not the posture of the Plaintiff's argument.  Rather, the Plaintiff first asserts that the Guaranty Assumption was fraudulently incurred due to FMP SA's lack of receipt of any consideration when it stepped into BIII's shoes.  Second, the Plaintiff alleges that the Guaranty Assumption was worthless—and FMP SA and the Owners *knew it*—thereby rendering the River North Litigation ***effectively inevitable***.  If this is true, then there is a compelling argument that the Settlement Agreement and the payments made thereunder were fraudulent transfers because the heart of the obligation sounds in fraud.  The Plaintiff essentially argues that FMP SA was continuing the fraud perpetrated under the Guaranty Assumption, which, if true, would be highly relevant even if the Guaranty Assumption transaction itself is not subject to avoidance.

The Plaintiff's method of proving that FMP SA and the Owners had preexisting knowledge that the Guaranty Assumption was worthless, thus potentially sounding in fraud, involves the Fresh

---

[148] Tex. Bus. & Comm. Code § 24.005(b)(10).

Lending Agreement. The Plaintiff alleges that FMP SA had "no assets or revenue stream" at the time of the Guaranty Assumption's execution.[149] The Plaintiff argues that knowledge of the guaranty's worthlessness may be reasonably imputed to FMP SA and the Owners because FMP SA knew that its revenue source (the management fees paid from Fresh) was hamstrung by restrictive covenants assumed under the Fresh Lending Agreement before the Guaranty Assumption's execution.

River North refutes these contentions by pointing to the same summary judgment evidence. First, River North asserts that FMP SA did, in fact, receive consideration for assuming BIII's preferred return obligation. Deposition testimony from Steven Madlinger, a River North representative, stated that:

> [T]he value that FMP received as a result of this agreement was no disruption to their revenue stream. So there was value given to FMP. To the extent that River North Furr's couldn't find or wasn't provided with an acceptable guarantor, then we would have blown up the transaction. We wouldn't have gone forward. We would have sued the parties.[150]

This non-cash consideration in connection with the Guaranty Assumption may have been adequate to escape a finding of fraudulent intent.[151]

Again, although the Guaranty Assumption itself is not subject to avoidance, if the obligation was based in fraud, that fraud relates to whether the Settlement Agreement was a fraud on creditors. Thus, whether the Guaranty Assumption was supported by consideration may raise

---

[149] Pl.'s Mem. L. Supp. Mot. Partial Summ. J. 6, ECF No. 94.
[150] Def.'s App. 307–08, 56:19–57:2 (Madlinger Dep.).
[151] The fair consideration concept is different from the consideration necessary to support a simple contract. Under fraudulent transfer law, courts inquire into the adequacy of the consideration given for an obligation. An antecedent debt qualifies as consideration under fraudulent transfer law, but not general contract law. *See generally*, Alemante G. Selassie, *Valuation Issues in Applying Fraudulent Transfer Law to Leveraged Buyouts*, 32 B.C. L. Rev. 377, 377–83 (1991) (discussing fair consideration in the fraudulent conveyance context in the article's introduction).

a genuine factual dispute—although it may not be a ***material*** factual dispute due to the Guaranty Assumption's insulation from avoidance attack.

All the same, the Court can easily identify a genuine dispute of material fact related to preexisting knowledge of the Guaranty Assumption's value to FMP SA at the time of execution. River North refutes the Plaintiff's allegation that FMP SA and the Owners had preexisting knowledge that the guaranty was worthless by highlighting the management fees received by FMP SA after the Guaranty Assumption's execution.  FMP SA received over $4 million in management fees between 2015 and 2019 from the restaurants for which the guaranty was provided between the Guaranty Assumption's execution on November 30, 2015, and March 18, 2020, when the Fresh Loan Agreement defaulted.  And River North's 2019 suit against FMP SA and the Owners on the guaranty showed that FMP SA generated ample revenue to meet its obligations under the Guaranty Assumption.

This Court sees FMP SA's preexisting knowledge of its ability to honor the Guaranty Assumption as a genuine dispute of material fact on a critical badge of fraud that speaks to the potential inevitability of the River North Litigation.  For clarity, the relevant focus is whether the Settlement Agreement and/or the Settlement Payments were incurred and/or paid with actual intent to hinder, delay, or defraud creditors.  On the one hand, a reasonable jury could find that the Settlement Agreement was entered into in furtherance of a fraud perpetrated in connection with the Guaranty Assumption.  That jury could reasonably find that a stench of fraudulent intent emanates from the Guaranty Assumption and extends all the way through the Settlement Agreement and corresponding payments.

On the other hand, a reasonable jury could also find that the decisions to enter into the Settlement Agreement and convey a security interest in FMP SA's property to facilitate the

Settlement Payments were made in good-faith to pay down a mandatory obligation, even though the Guaranty Assumption might have been incurred through fraud. The liability for this alleged fraud is set in stone, as the statutes of limitations and repose have run on the Guaranty Assumption. Thus, a reasonable jury could conclude that the decision to pay that debt was not only lacking fraudulent intent—it improved FMP SA's financial position. Because the Guaranty Assumption is not subject to avoidance, the estate would be exposed to the River North Litigation liability regardless. Notably, this remains the case even if the Settlement Agreement is avoided here. A reasonable jury could find that the resolution of what was projected to be $2.5 million in litigation liability for a $1.85 million settlement was a significant *asset* to the estate—just as FMP SA's legal counsel suggested when it said the Settlement Agreement was a "win."

The badge of fraud regarding a transfer that occurs shortly before or after a substantial debt was incurred is integrally linked to a badge of fraud involving the pendency or threat of litigation. FMP SA conveyed a security interest in the Collateral Account when it incurred the $1.85 million settlement obligation—which can be fairly characterized as a "substantial debt" in relation to FMP SA's assets at the time. After the Settlement Agreement was entered and the $1.85 million was transferred to the Collateral Account, FMP SA had only $6,023.23 remaining in its Operating Account. The Plaintiff also offers this fact as a badge of fraud, as the $1.85 million was substantially all of FMP SA's cash assets at the time of the transfers.

### ii.   *Alleged fraud in connection with the PPP loans*

The second set of fraud allegations stems from the alleged misuse of PPP loans. The Plaintiff's allegations of actual fraud involve not only the River North transactions, but also the source of the funds paid to River North under the Settlement Agreement. The Court is aware that

abuse of PPP loans has been an alarming trend across the country.[152]  The Plaintiff argues that this

adversary proceeding implicates such abuse.

The Plaintiff alleges that, notwithstanding that PPP funds were specifically designated for

items such as payroll and rent, the Debtors (at the Owners' instructions) failed to direct or apply

most of the PPP funds to permitted expenses.  The Plaintiff essentially contends that the PPP funds

used to pay River North were contrary to the certifications made in the PPP Loan Applications and

the PPP Forgiveness Applications.  The Plaintiff contends that this was a fraud on the United States

Government.  And this fraud may have occurred when the PPP Loan Applications were submitted,

when the funds were allegedly misused, and/or when the PPP Forgiveness Applications were filed.

Despite the seriousness of these allegations, actual illegal activity alone is not enough to

presume actual intent to defraud.  *See Geron v. Craig (In re Direct Access Partners, LLC)*, 602

B.R. 495, 541 (Bankr. S.D.N.Y. 2019).[153]  A presumption of actual fraudulent intent has only been

applied by courts dealing with Ponzi schemes, where the scheme was so "inherently fraudulent"

that the plaintiff's burden of proving actual intent to hinder, delay, or defraud was judicially

---

[152] David Nanz, *How the FBI Is Combating COVID-19 Related Fraud*, FBI Springfield Press Off., https://www.fbi.gov/contact-us/field-offices/springfield/news/how-the-fbi-is-combatting-covid-19-related-fraud#:~: text=Unfortunately%2C%20many%20thousands%20of%20people,in%20fraud%20from%20the%20PPP (Jan. 12, 2024) ("The U.S. Small Business Administration inspector general estimates $136 billion in fraud from the EIDL and $64 billion in fraud from the PPP.  For FPUC, the U.S. Government Accountability Office estimates more than $100 billion in fraud.  Combined, these losses make the fraud the largest in history.").
[153] *See also, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (stating that allegations that a party obtained money by fraud were not sufficient to show that payments to other parties were made with fraudulent intent, because the "fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street"); *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1510 (1st Cir. 1987) (holding that dishonesty in the acquisition of funds is not sufficient and that fraudulent conveyance law "is basically concerned with transfers that 'hinder, delay or defraud' creditors" and not the manner in which funds were obtained); *Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 810 (Bankr. S.D.N.Y. 2005) (refusing to hold transferee liable on actual fraudulent conveyance claim despite allegations that transferor engaged in fraudulent activity by inflating accounts receivable and inventory and that transferee likewise perpetrated a fraud).

waived. *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("In this circuit, proving that [the defendant] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006))).[154]

And although PPP loan fraud may be a pressing public issue, no court has found a PPP fraud scheme to be so "inherently fraudulent" that it gives rise to a ***presumption*** that all transfers in connection with the enterprise were made with actual fraudulent intent. This Court is unaware of any decision extending this "inherently fraudulent" presumption beyond the Ponzi scheme scenario—and the Court will not do so here. The decision to extend a presumption of fraudulent intent to a new area is better left for Congress or a higher court. At bottom, "criminal behavior in raising funds or in operating a business, while reprehensible, does not warrant a fraudulent conveyance claim unless the perpetrators of the crime intended that transfers of funds by the business would hinder, delay or defraud creditors . . . ."[155] Simply put, the ***transfer itself*** must be made with fraudulent intent.

But even without a Ponzi-like scheme, River North's contention that Section 7(a) of the Small Business Act "does not purport to limit what borrowers do or do not do with money they receive" is a blatant misstatement of law.[156] There is little doubt, from the summary judgment evidence, that PPP funds were used in violation of the CARES Act and SBA regulations—which would seem to be a scarlet badge of fraud. For relevant background, the Paycheck Protection

---

[154] A Ponzi scheme is insolvent from its inception as a matter of law, and all transfers are presumed fraudulent. *Warfield*, 436 F.3d at 558 (citing *Cunningham v. Brown*, 265 U.S. 1 (1924), which assessed fraudulent transfers in the original Ponzi scheme case perpetrated by Charles Ponzi).
[155] *Direct Access Partners*, 602 B.R. at 541.
[156] *See* Def.'s Br. Opp'n Pl.'s Mot. Partial Summ. J. 32, ECF No. 98.

Program was not established as a standalone aid program.  Rather, the CARES Act was codified

under Section 7(a) of the Small Business Act.[157]  The CARES Act provided that, unless otherwise

stipulated, Section 7(a) loans would be guaranteed by the Small Business Administration ("SBA")

"under the same terms, conditions, and processes" as other Section 7(a) loans.[158]  Violations of

federal law occurred here under the relevant SBA provisions in at least two ways.

First, SBA regulations prohibit Section 7(a) borrowers from paying or distributing any part

of the loan proceeds to (1) an officer, director, key employee, or owner of more than 20% of the

borrower; (2) any entity in which the previously mentioned persons owns or controls at least 20%;

or (3) any individual or entity in control of or controlled by the borrower.[159]  The Owners were

officers, directors, key employees, and/or 20% or more owners of all the PPP Borrowers, the

Owners held 20% or more of the equity in non-borrowing entities that received the PPP funds, and

the PPP Borrowers controlled (directly or indirectly at the will of the Owners) the entities where

the PPP funds were sent:  TXFMP and FMP SA.  Thus, the Plaintiff accurately identifies that the

Owners and the PPP Borrowers violated the Small Business Act by causing the borrowers to

distribute ***any*** part of the PPP loan proceeds to FMP SA.  The PPP funds were sent to ***all three*** of

the statutorily designated places where PPP funds ***may not*** go.  Moreover, a Section 7(a) borrower

---

[157] *See* 15 U.S.C. § 631 *et seq.*; *see also Bruckner Truck Sales, Inc. v. Guzman*, No. 2:23-CV-097-Z, 2023 WL
8606761, at *1 (Bankr. N.D. Tex. Dec. 12, 2023); *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 410 (2d Cir. 2022)
(acknowledging the PPP's placement under Section 7(a) of the SBA's loan program); *Pharaohs GC, Inc. v. U.S. Small
Bus. Admin*., 990 F.3d 217, 224 (2d Cir. 2021) (same).
[158] 15 U.S.C. § 636(a)(36)(B); *see* Pub. L. No. 116-136, 134 Stat. at 286 (amending "Section 7(a) of the Small Business
Act").
[159] *See* 13 C.F.R. §§ 120.10 (2020) (SBA Definitions), 120.130(a) (2020) (Restrictions on Uses of Proceeds).

may not use the loan proceeds for any purpose that does not benefit the specific borrower—and as River North points out at its own peril—FMP SA was not a PPP Borrower.[160]

Second, even if FMP SA were a borrower eligible to receive PPP funds, using the funds to make the Settlement Payments to River North was still an improper use of PPP loans under the CARES Act and SBA regulations.[161]   The PPP Borrowers certified in their PPP Forgiveness Applications that the funds were used for payroll costs, business rent or lease payments, business utility payments, and business mortgage interest payments.   Although these PPP funding uses would be permissible under the relevant statutes, paying off a litigation settlement is nowhere on the list of permissible uses for these loans.   And a "redemption payment" to liquidate an equity interest—which is how the Plaintiff characterizes the Settlement Payments—is also notably missing from the statutorily permissible uses for PPP loans.   It is also worth mentioning that no PPP Borrower selected "other" as a potential use for the funds on the PPP Loan Applications, thereby limiting the fund usage to payroll, lease/mortgage interest, and utilities—and no other purpose.

These two flagrant violations of federal law carry significant legal liability.   PPP loan applications require certifications that the borrower is aware that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."[162] Civil and criminal liability may arise under 18 U.S.C. §§ 1001 and 3571 (fraud and false statements generally), 18 U.S.C. § 1014 (fraud in connection with credit applications at a federally insured institution), and

---

[160] *See* 13 C.F.R. § 120.130(f) (2020) (Restrictions on Uses of Proceeds).
[161] *See* 15 U.S.C. § 636(a)(36)(F) (enumerating eleven proper uses for covered loans, which include PPP loans).
[162] *See* Pl.'s App. vol. II, at 138 (Alamo Dynamic PPP Loan Application).

15 U.S.C. § 645 (fraud in connection with SBA loans).[163]  In addition, liability may arise under the False Claims Act and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as well as the bank fraud, wire fraud, and mail fraud statutes.[164]  Analyzing potential liability outside the fraudulent conveyance context is perhaps for another day in another court.  But the high likelihood of legal violations committed in connection with the PPP loans is telling of actual fraudulent intent.

Meanwhile, River North argues on the same record that there is no evidence of fraudulent intent *at the time the loan applications were submitted*, even if the funds were misused *later*.  That scenario is distinguishable from one where a PPP loan is requested and obtained with *present* fraudulent intent.  Procuring a loan and misusing the funds later is not necessarily indicative of intent to misuse the funds *at the time the loan application was submitted*.  The early COVID-19 days were filled with economic uncertainty.  So this situation is hardly far-fetched—where a PPP borrower obtained a loan in good-faith, but misused the funds later when business conditions deteriorated further.  FMP SA's barrel towards bankruptcy tracks with this hypothetical scenario.

Even still, imputable material knowledge and the timing of the transfers weighs heavily against River North's position.  First, it is undisputed that Calvert, in his capacity as corporate controller, knew that PPP funds would be used to facilitate the Settlement Payments.  It is further undisputed that AB&T, evidenced by Klussman's sworn declaration, knew that PPP funds were

---

[163] *See* referenced statutes and PPP Borrower certifications made at Pl.'s App. vol. II, at 138 (Alamo Dynamic PPP Loan Application).

[164] *See* False Claims Act, 31 U.S.C. §§ 3729–33; Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183; 18 U.S.C. § 1344 (bank fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1341 (mail fraud).

being used to make the Settlement Payments—all while AB&T was the PPP lender to the PPP

Borrowers, the issuer under the Letter of Credit, and the bank where FMP SA's Operating and

Collateral Accounts were held (along with many other Fresh Enterprise accounts).  There is no

legal basis to preclude imputing knowledge of the relevant PPP and SBA loan statutes to all the

parties—and they all had competent legal counsel.  In any event, River North and AB&T's state

of mind is irrelevant.  Actual fraudulent intent is measured from the perspective of the debtor-

transferor—not the transferee(s).  *See Res. Dev. Int'l*, 487 F.3d at 301.

Focusing on FMP SA's state of mind through Calvert's testimony, a genuine dispute as to

a material fact exists regarding FMP SA's knowledge that PPP funds were intended to be misused

at the time the PPP Loan Applications were submitted.  River North argues that Calvert "truthfully

certified in those applications that the companies needed the funds for the purposes stated after

providing accurate information about the number of employees and relevant expenses."[165]

Granted, these certifications were apparently made with hesitancy.[166]  Even so, Calvert's sworn

statements create more than mere metaphysical doubt.  It is specific, sworn testimony that speaks

to the lack of requisite fraudulent intent for the underlying claim.

Next, the timing of the transfers is a clear badge of fraud weighing in the Plaintiff's favor.

The PPP Loan Applications were filed on April 7, 2020, and the funds were disbursed in late April

2020.  The Settlement Agreement was executed on May 13, 2020, the Letter of Credit was

executed the next day, and the first Settlement Payment was made on May 15, 2020.  River North

---

[165] Def.'s Reply Br. Supp. Mot. Summ. J. 26, ECF No. 103 (first citing Def.'s App. 578, 250:8-251:16 (Calvert Dep.); and then citing Def.'s App 258 (Calvert Email Re: PPP Forgiveness)).
[166] *See* Def.'s App 258 (Calvert Email Re: PPP Forgiveness) ("I'm not comfortable testifying that PPP money out was used/spent on forgivable expenses.").

would have this Court ignore these temporal points.  But these facts are relevant, considering the "general chronology of events," as well as "other factors relevant to the transaction."  *See Soza*, 542 F.3d at 1067; *Fedders N. Am.*, 405 B.R. at 545.

In addition, fraud may have occurred in connection with the PPP Forgiveness Applications. To be eligible for forgiveness, the relevant SBA statutes require that the PPP borrower certify that "at least 60 percent of the covered loan amount for payroll costs, and may use up to 40 percent of such amount" for other listed expenses.[167]  The borrower must also certify that all information is true and correct, and:

> [T]he amount for which forgiveness is requested was used to retain employees, make interest payments on a covered mortgage obligation, make payments on a covered rent obligation, make payments on covered operations expenditures, make payments on covered property damage costs, make payments on covered supplier costs, make payments on covered worker protection expenditures, or make covered utility payments.[168]

Knowingly making false or fraudulent representations to an FDIC-insured institution to obtain a loan is fraud per se.  *See Loughrin v. United States*, 573 U.S. 351, 354–55 (2014); 18 U.S.C. § 1344(2) (bank fraud).  Likewise, so is concealing the true identity of the party that will be using borrowed money from an FDIC-insured institution.  *See United States v. Doke*, 171 F.3d 240, 245 (5th Cir. 1999).  Both appear to have occurred here.  The PPP Borrowers made false representations to their PPP lender—AB&T.  They also made false representations to the United States government (a major creditor in the Bankruptcy Case) by certifying that they would use all the PPP loan proceeds to make payroll and keep their own facilities open—only to then funnel

---

[167] 15 U.S.C. § 636m(d)(8).
[168] 15 U.S.C. § 636m(e)(3) (emphasis added).

some of the assets to non-borrower FMP SA within a few weeks.  PPP Borrowers used the funds

for an improper purpose shortly after certifying to the contrary, and then applied for forgiveness

reiterating the same certifications.  To be clear, this Court is not called to adjudicate PPP loan

fraud—nor should it.   But if PPP loan fraud occurred, that would serve as compelling

circumstantial evidence of actual fraudulent intent, when FMP SA used those funds to pay River

North.  In any event, these considerations are still better left to a jury.

Lastly, River North advances three other arguments that should be disposed of.  First, River

North points out that the relevant PPP statutes do not create a cause of action.[169]  This is of no

import.  Moreover, this Court need not even make an express finding that the relevant SBA statutes

were violated.  This Court, in addressing some of the law and facts surrounding the PPP loans is

merely assessing a potential badge of fraud.

Second, River North argues that the Settlement Payments cannot be avoided as actually

fraudulent because FMP SA was not a PPP Borrower—and the Plan Trustee stands in FMP SA's

shoes.  River North essentially argues that there is no predicate creditor harmed.  This is also

incorrect.  AB&T is FMP SA's largest creditor, and FMP SA was liable to AB&T for over $13

million at the time of the Settlement Payments.  Section 548(a)(1)(A) only requires that a debtor

make a transfer with actual intent to hinder, delay, or defraud "***any entity*** to which the debtor was

or became, on or after the date that such transfer was made or such obligation was incurred,

indebted . . . ."  Thus, if any creditor of FMP SA—including AB&T—was harmed by the transfer,

then the Plan Trustee has standing to avoid that transfer as actually fraudulent.  As was discussed

---

[169] Assuming this is the case, this Court suspects that the Department of Justice has all the teeth it needs to prosecute
PPP loan-related fraud through bank fraud, wire fraud, mail fraud, FCA, FIRREA, and Racketeering statutes.

previously, the $1.85 million that entered FMP SA's Operating Account became its property at that point. When those assets were transferred from FMP SA for the benefit of, and ultimately to, River North, **all creditors** were presumptively harmed by that diminution of the estate. Admittedly, it seems somewhat counter-intuitive to claim that AB&T was the creditor harmed, when AB&T positioned itself at the center of the transactions. This includes the Letter of Credit and the PPP loans. It is hard to see how the Settlement Agreement, the conveyance of FMP SA's funds into the Collateral Account, and the Settlement Payments harmed AB&T when AB&T itself was an active, willing, and informed participant in what appears, on the surface, to have been arm's-length transactions. This arguably might seem to be irrational actions undertaken by AB&T. Why would AB&T structure transactions that result in its own borrowers extracting estate assets for River North's benefit that would otherwise have flowed to AB&T as an equal-priority (or perhaps secured) creditor? These questions demonstrate the need for a jury to weigh in.

Third, River North contends that the Plan Trustee cannot prevail on a fraudulent conveyance theory because he cannot trace the PPP funds to any particular PPP Borrower. It is true that the funds lost traceability to each of the six individual PPP Borrowers when they were commingled in TXFMP's money market account, before their subsequent departure to FMP SA's Operating Account. But this fact bears no weight. Again, this is not an action to impose liability for PPP-related fraud. This is an action to avoid allegedly fraudulent transfers, and the existence of PPP fraud simply serves as a badge of fraud, potentially building towards an actual fraudulent intent inference. The Plaintiff does not have to trace fraudulently used PPP funds to establish a fraudulent transfer. He merely must identify transferred estate property—and he has done so by identifying the $1.85 million that left FMP SA's accounts by way of the Settlement Payments.

In sum, the issues surrounding the Guaranty Assumption and the PPP-related activities are fact-intensive inquiries where the credibility of evidence and witnesses, in particular, should be weighed at trial.  Accordingly, this Court has determined that genuine disputes of material fact exist as to whether FMP SA had actual intent to hinder, delay, or defraud its creditors when it transferred the Challenged Funds.  Thus, both competing Motions for Summary Judgment should be denied in part as to the actual fraudulent transfer claims.

### 2. *River North is entitled to summary judgment on the constructive fraudulent transfer claims.*

The Plaintiff also seeks to avoid the Settlement Payments and/or the obligations created pursuant to the Settlement Agreement as constructively fraudulent under TUFTA § 24.005(a)(2), via Bankruptcy Code § 544(b), and also under Bankruptcy Code § 548(a)(1)(2) and—in either case—to recover the prepetition Settlement Payments and/or their value pursuant to Bankruptcy Code § 550.  The Defendant has moved for summary judgment on the constructive fraudulent transfer claims, but the Plaintiff has not.  The Defendant, of course, may prevail if it establishes that the summary judgment evidence contains insufficient proof concerning an essential element of the nonmoving party's claim.  The burden then shifts to the Plaintiff, as the nonmoving party, to submit or refer to evidence, that shows that a genuine issue does exist as to the applicable essential element.  The Plaintiff, as nonmovant, may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.

This Court concludes that the Defendant is entitled to summary judgment on the constructive fraudulent transfer claims as further explained below—the key reason being that the essential element of "lack of reasonably equivalent value" in connection with the Settlement Agreement and Settlement Payments cannot, as a matter of law, be genuinely disputed here.  To be sure, this Court's determination regarding "reasonably equivalent value" is a fact issue.  But, as

explained below, the material subsidiary facts that lead to this Court's ultimate factual finding on reasonably equivalent value are not in dispute.  So, summary judgment is, indeed, appropriate. This may all seem odd, at first blush, that the "actual fraud" theories here should go to trial, but the Plaintiff's "constructive fraud" theories do not survive summary judgment.  But the answer lies in the technical requirements of the applicable statutes.  "Actual fraud" is very factually intensive.  While facts do matter regarding "constructive fraud," it is nevertheless a little more formulaic.

Section 548(a)(1)(B) permits a trustee to avoid a constructively fraudulent transfer, which is one that occurs within two years of the petition date, where the debtor (1) received "less than a reasonably equivalent value in exchange for such transfer or obligation;" and (2) "was insolvent on the date that such transfer was made or such obligation was incurred . . . ."  TUFTA §§ 24.005(a)(2) and 24.006 (again, available to the Plaintiff here under § 544(b)), require the same elements for avoiding a constructively fraudulent transfer—but provide a four-year look back period.[170]  As noted earlier, the Guaranty Assumption was executed well before the four-year look back period, so the obligation incurred therein is technically not avoidable.  The focus here must be on the obligation imposed on the Debtor FMP SA under the Settlement Agreement and also on the Settlement Payments made by it pursuant thereto.  In both instances, no genuine dispute of material fact exists as to the Plaintiff's inability to meet at least the "less than reasonably equivalent value" element.

---

[170] *See* Tex. Bus. & Comm. Code § 24.010(a)(1)–(2) (providing a four-year look back period for actual and constructively fraudulent transfers).

"Reasonably equivalent value" is not defined in the Bankruptcy Code, but "value" is defined. "Value" is defined as, among other things: "satisfaction or securing of a present or antecedent debt of the debtor . . . ."[171] Determining "*reasonably equivalent* value" is left to the courts. The Supreme Court has described "reasonably equivalent value" as "value that is substantially comparable to the worth of the transferred property." *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994). In addition, under the "indirect benefit" rule, the debtor need not receive a benefit directly; this Court has specifically stated that, "one must look at a transaction or series of transactions as an integrated whole and analyze the net economic benefit to the debtor from the viewpoint of value received by the debtor at the time of the transfer." *Halperin v. Wills (In re Senior Care Ctrs., LLC)*, Ch. 11 Case No. 18-33967-sgj11, Adv. No. 20-03178-sgj, 2023 WL 7137097, at *14–16 (Bankr. N.D. Tex. Oct. 29, 2023) (collecting cases). This indirect benefit rule defeats the Plaintiff's contention that, because the **Owners** received a direct benefit in the Settlement Agreement (by virtue of the release of the tort claims asserted against them), FMP SA could not have received reasonably equivalent value. Of course, FMP SA did actually receive a direct benefit itself—in that it was released from its antecedent debt under its Guaranty Assumption (and, subsequently, its antecedent debt created under the Settlement Agreement).

Additionally, in the context of an antecedent debt being satisfied with a payment or payments, case law has made clear that it is difficult to attack satisfaction of such debt as a *fraudulent transfer*—as opposed to potentially a *preferential transfer*. Again, the antecedent debt at issue here is FMP SA's obligations under Guaranty Assumption, and then the subsequent

---

[171] 11 U.S.C. § 548(d)(2)(A).

Settlement Agreement.  When it comes to payments on antecedent debts, the debtor "need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." *Fairchild*, 6 F.3d at 1125–26; *Williams v. McKesson Corp. (In re Quality Infusion Care, Inc.)*, Ch. 7 Case No. 10-36675, Adv. No. 13-3056, 2013 WL 6189948, at *6 (Bankr. S.D. Tex. Nov. 25, 2013) ("A payment that a debtor makes pursuant to the terms of a pre-petition settlement agreement is made 'for or on account of an antecedent debt . . . .'" (citations omitted)).[172]  As to value received in a settlement, the agreement "need not result in the best possible outcome for the debtor but must not fall beneath the lowest point in the range of reasonableness."  *Gilmour v. Conn. Gen. Life Ins. (In re Victory Med. Ctr. Mid-Cities, LP)*, 601 B.R. 739, 749 (Bankr. N.D. Tex. 2019) (in bankruptcy case of medical services provider, trustee brought adversary proceeding to avoid prepetition settlement between debtor and insurer that administered employee health benefit plans as alleged constructively fraudulent transfer, and parties cross-moved for summary judgment; court held that bankrupt medical services provider received "reasonably equivalent value" for entering into settlement, so as to preclude avoidance of settlement as constructively fraudulent transfer; court noted that it need not conduct a trial to determine all of the relevant legal and factual issues—instead it should canvass the issues and satisfy itself that the settlement agreement was within the range of reasonableness and it allowed the debtor to avoid risky, and potentially lengthy, costly, litigation and to obtain relatively quick benefits to save its business).

---

[172] *See also Pritchard v. Wright Cap. Corp. (In re Ecco Drilling Co.)*, Ch. 11 Case No. 07-60987, Adv. No. 09-6036, 2011 Bankr. LEXIS 3126, at *10 (Bankr. E.D. Tex. Aug. 12, 2011) ("The settlement agreement giving rise to the allegedly preferential transfer compromised and settled a debt owed by the Debtor prior to the satisfying transfer.  That is precisely the definition of an antecedent debt." (citing *Baker Hughes Oilfield Op. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 399 (5th Cir. 2005))).

First, with regard to the Settlement Agreement itself (and the obligations created thereunder), there is no summary judgment evidence suggesting that the Settlement Agreement was entered into on any basis other than to allow the debtor to avoid risky, and potentially lengthy and costly litigation and to obtain relatively quick benefits to save its business.  There is no summary judgment evidence to suggest that, considering these factors, the Settlement Agreement was not within the range of reasonableness.[173]  This Court cannot find anything in the summary judgment record to suggest that the $1.85 million Settlement Agreement that reduced FMP SA's potential exposure of $2.5 million, was below an acceptable range of reasonableness.  Therefore, the Settlement Agreement itself was not entered into for less than reasonably equivalent value.

The Settlement **Payments** were also not constructive frauds, as they paid down a dollar-for-dollar antecedent debt arising from the Settlement Agreement.  *See Jalbert v. Wessel GmbH (In re La. Pellets, Inc.)*, 838 F. App'x 45, 50 (5th Cir. 2020) ("When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt . . . the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value . . . ." (citing *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 766 (Bankr. W.D. La. 2013) (collecting cases))).  Therefore, this Court likewise concludes as a matter of law that the Settlement Payments were not made without FMP SA receiving reasonably equivalent value in exchange.

Because the undisputed summary judgment evidence shows that the Settlement Agreement and the Settlement Payments were not entered into and/or paid without FMP SA receiving

---

[173] *See* Def.'s App. 481, 89:4–16, 484, 101:6–18 (Brodrick Dep.) (testifying in deposition that "[l]ike we [(Ogletree)] do in any settlement, we undertook an analysis as to whether what was given versus what was received was fair under the circumstances" and concluded the settlement "was more than fair" to FMP SA).

reasonably equivalent value, this Court need not reach the insolvency issue.  The Plaintiff cannot meet his burden on one essential element of a constructive fraudulent transfer—i.e., reasonably equivalent value.  Accordingly, partial summary judgment should be entered for River North.

### 3. *The Plaintiff is entitled to summary judgment on the § 549(a) postpetition transfer.*

This Court earlier extensively explored herein whether the funds in the FMP SA Operating Accounting, the Collateral Account, and the Settlement Payments themselves were property of the Debtor FMP SA that would have been property of the estate if not transferred to River North.  This Court concluded yes—and that the first relevant transfer of property of the Debtor FMP SA occurred when $1.85 million was transferred out of its Operating Account into the Collateral Account.  This transfer, alone, was enough to satisfy the § 548 and TUFTA requirement that there be a "transfer of an interest of the debtor in property"—for purposes of establishing a possible fraudulent transfer.  However, the Court also concluded that the Debtor FMP SA retained a property interest in the Challenged Funds even *after* they went into the Collateral Account (despite AB&T's control over same), and in the Settlement Payments that were made therefrom.  Accordingly, there can be no doubt that the Plaintiff is entitled to summary judgment on the one postpetition transfer—the final $112,500 payment to River North.

Under § 549(a), a postpetition transfer of property of the estate is avoidable, subject to limited exceptions inapplicable here, if the transfer (1) "occurs after the commencement of the case;" and (2) "is not authorized under this title or by the court."  Irrefutable evidence shows that this occurred.  April 20, 2021 was the Petition Date, and the last payment of $112,500 was made to River North on April 30, 2021.  This Court did not authorize the payment, nor did the Bankruptcy Code.

River North's only prayer on this claim rests on its theory that none of the Challenged Transfers were property of the estate. But this argument was rejected earlier herein. As there can be no genuine dispute as to this material fact, this Court holds that the final $112,500 payment is an avoidable postpetition transfer under § 549(a). Thus, partial summary judgment should be entered for the Plaintiff on this claim and River North's motion should be denied in kind.

## VI.  <u>RECOMMENDATION TO THE DISTRICT COURT</u>

For the reasons discussed above, this Court recommends that the District Court deny both parties' Motions for Summary Judgment in part on the actual fraudulent transfer Counts I and II, pursuant to 11 U.S.C. § 548(a)(1)(A) and the Texas Business and Commercial Code §§ 24.005(a)(1). Those claims should proceed to trial. This Court further recommends that the District Court grant River North's Motion for Summary Judgment in part on the constructive fraud Counts III, IV, and V, pursuant to 11 U.S.C. § 548(a)(1)(B) and the Texas Business and Commercial Code §§ 24.005(a)(2) and 24.006 (available to the Plaintiff under 11 U.S.C. § 544(b)). Summary judgment for River North should be entered accordingly. Lastly, this Court recommends that the District Court grant the Plan Trustee's motion in part and correspondingly deny River North's motion in part on the postpetition transfer Count VI, pursuant to 11 U.S.C. § 549(a). Summary judgment for the Plan Trustee should be entered accordingly.

### END OF REPORT AND RECOMMENDATION###